**Mary H. KAPRELIAN,**
**Plaintiff-Appellee,**

v.

**TEXAS WOMAN'S UNIVERSITY et**
**al., Defendants-Appellants.**

No. 74–1503.

United States Court of Appeals,
Fifth Circuit.

March 5, 1975.

**134**

Frank C. Cooksey, Asst. Atty. Gen., John L. Hill, Atty. Gen., William C. Bednar, Jr., Asst. Atty. Gen., Larry F. York, First Asst. Atty. Gen., Austin, Tex., for defendants-appellants.

Michael J. Whitten, Denton, Tex., for plaintiff-appellee.

Before RIVES, GODBOLD and GEE, Circuit Judges.

GEE, Circuit Judge:

This is a teacher discharge case in the *Roth-Sindermann*[1] vein.

Plaintiff Mary Kaprelian was employed by defendant Texas Woman's

---

1. Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

University (TWU) for the academic year commencing September 1970, primarily to teach modern dance. Formally, she was to be an assistant professor in the College of Health, Physical Education and Recreation, of which defendant Anne Schley Duggan was Dean. The record hints that Dean Duggan, under whose long guidance the department had become a college with a national reputation and who was nearing retirement, may have seen in Dr. Kaprelian a fitting successor. What ensued, instead, was a year of clashes over policy between two able and strong-minded women. Dean Duggan, expecting Kaprelian's cooperation and support in existing programs and arrangements, felt she did not receive it. For her part, Dr. Kaprelian, who enjoyed a lively appreciation of her own worth and abilities,[2] felt and demonstrated that she felt TWU's dance theory and training were behind the times

and inferior, even to others available elsewhere in Denton, Texas, the small city of its location.[3] And so passed the academic year.

On July 8, 1971, shortly after its end, TWU's Vice-President for Academic Affairs requested Kaprelian's resignation, advising that he held written statements from various members of her department indicating unprofessional conduct on her part and disloyalty to TWU. He refused to particularize these charges and made no offer to show her the statements; and she declined to resign and consulted counsel.

On July 20, 1971, her attorney wrote to Dr. John A. Guinn, President of TWU and our third and last defendant, finding fault with the handling of her case and requesting that an ad hoc committee of the faculty be convened to consider it, pursuant to established procedures.[4]

2. In her testimony, she averred that her students ". . . will remember me as one of the outstanding teachers that they have had." Noting that she was under oath and therefore must be candid, she added: ". . . I am highly competent. . . . I'm good in research . . . I ain't no dummy."

3. Speaking of one TWU dance program, she testified: ". . . the dances as I saw them were nothing I wanted to have anything to do with . . . I had too much to offer in front of that mess, rubbish." Dance theory at TWU was, she stated, "not educational" and only ". . . recognized here in Texas where they haven't seen anything else." Had there been intercollegiate competition with other schools, ". . . TWU dancers would come up losers, they are technically very deficient, they don't have a chance." To her classes, she made ". . . comments as to weaknesses in the program . . ." and ". . . encouraged them to go over to North Texas [also in Denton] because this would be—it would better their background."

4. As to untenured teachers such as Kaprelian, the Faculty Handbook provided:

FACULTY MEMBERS WITHOUT TENURE. When a faculty member does not have tenure but contends that the termination or renewal of his contract constitutes a violation of academic freedom, the burden of proof is upon the faculty member. He may submit to the President a written request that his allegations be given consideration by an ad hoc committee of the faculty. This committee shall recommend

whether a hearing is warranted. If the finding of the committee is against the faculty member, the action is final. If the faculty committee finds that a hearing is warranted, the faculty member may then have recourse to the same procedures for hearings as outlined above.

The "procedures for hearings as outlined above" are those for discharge of tenured faculty:

FACULTY MEMBERS WITH TENURE. When the employment of a faculty member with tenure is terminated for cause, written notice, stating the reasons for non-reappointment, shall be given the faculty member by the President. Opportunities will be available for the faculty member to discuss the matter informally if he so desires. If thereafter, the faculty member still feels that he has been unfairly treated, he may submit within fifteen days a written request for a hearing by the elected standing committee on tenure, which shall consist of only faculty members with tenure. The faculty member may appear before the committee, with a colleague of his own selection, if desired, to present appropriate information in his behalf. After the hearing, the standing committee on tenure shall transmit its findings in writing to the President and to the faculty member.

If the faculty member is dissatisfied with the action of the committee, he may submit to the President a written request for a hearing of his case by the Board of Regents. If the Board authorizes such hear-

The next day Guinn forwarded Kaprelian a notice of her terminal reappointment to the faculty for the 1971–72 academic year, which she accepted. In a letter transmitting her acceptance to Guinn, however, her attorney reserved her rights, renewed his earlier requests, and added a request for the names and addresses of anyone who had termed Kaprelian unprofessional or disloyal to TWU. Receiving no reply,[5] he wrote again to Guinn, requesting a private conference and delivering himself somewhat freely—the letter refers to "character assassinations," "dictatorial abuses of power," "witch hunt(s)," etc. Commencing with such expressions, and warming to the subject, counsel assured Guinn that if the case went to court Kaprelian would prevail; that testimony would be presented which would reflect unfavorably on TWU before the public, the profession and the legislature and would be painfully embarrassing to Dean Duggan (including that relating to asserted personal failings of hers);[6] and suggested that the matter would be best settled within the university and without airing the supposedly unpleasant facts.

On September 2, 1971, President Guinn wrote to Dr. Kaprelian, advising that should she make a written request he would activate the ad hoc committee contemplated by the Faculty Handbook. By now, however, Kaprelian's attorney felt this would not satisfy. He responded on September 7 with the suggestion that Dr. Guinn, as head of an administration which disagreed with Dr. Kaprelian about her rights, could not appropri-ately appoint the committee. Instead, Guinn should appoint a member, Kaprelian one, and the two should agree upon a third. Three days later, in a letter to Guinn's counsel, Kaprelian's enlarged upon his conditions. Guinn's offer of an ad hoc committee to hear her matter was now unacceptable, he advised, because:

1. We have been offered no part in the process of selecting the members of such a committee;

2. It has been made clear that Dr. Kaprelian will not be allowed to have counsel represent her at such a hearing;

3. It has been made clear that Dr. Kaprelian will not be allowed to make any record of the hearing by Court Reporter or tape recording;

4. The university still refuses to disclose whatever information it has which would specify the manner in which Dr. Kaprelian is alleged to have been disloyal and unprofessional, nor will the university disclose the names of any persons making such allegations, nor will the university disclose any documentary evidence it might have to support such charges.

This apparently brought the administrative process to a stand, and suit, asserting violation of Kaprelian's civil rights,[7] was filed on October 15, 1971. A hearing set for December 15, 1971, to consider temporary relief, was apparently not held; and at last, at a pre-trial hearing on February 1, 1973, the parties submitted the case on briefs and depositions.

---

ing, arrangements shall be made for those having an interest in the matter to be present so that both sides of the controversy may be fairly presented. The decision of the Board shall be final.

When a faculty member who is notified that his position is discontinued as a result of financial exigency of the phasing out of an institutional program requiring reduction of faculty can present prima facie evidence of discriminatory treatment or infringement of academic freedom, he may file with the President a written request that this evidence be given consideration by an ad hoc committee of the faculty. At this hearing, the burden of proof shall be on the faculty member. The faculty committee shall recommend whether a hearing is warranted. If the finding of the committee is against the faculty member, the action is final. If the committee finds that a hearing is warranted, the faculty member may then have recourse to the same procedures for hearings as outlined above.

5. Guinn testified that he referred such letters from lawyers to his counsel, the Attorney General of Texas.

6. As to which, it is fair to note, no competent evidence whatever was presented.

7. 42 U.S.C. §§ 1981, 1983 and 1988.

In December of that year the court entered findings and an order generally favorable to Kaprelian, from which this appeal proceeds.

The court found, as was essentially undisputed, that Kaprelian had no form of tenure and hence no "property" interest. It concluded, however, that she had established a "liberty" interest *by filing her complaint*:[8] ". . . her *allegation* that defendants terminated her contract because of unprofessional conduct and disloyalty to the University is sufficient to *establish* an interest in liberty under the due process clause of the Fourteenth Amendment." (Emphasis added.) Since she had done so, the court reasoned, and since no hearing had been held, the matter should go back for hearing to a university forum. At that hearing plaintiff was to have the right to counsel and court reporter, both at her own expense. Moreover, to insure that the tribunal would possess the "actual" impartiality and "academic expertise" which the court saw as mandated by our *Duke* and *Ferguson*[9] opinions, the court reached into the administrative process itself to determine the tribunal's composition. The hearing committee would be composed of a number of persons appointed by the defendants, but only from those of ". . . academic expertise *in plaintiff's field of study*,[10] whether within or without the University." A like number of such persons would be appointed by plaintiff; and the committee members, or in the event of their inability to agree the court, would appoint the final member. On motion of defendants,

the order was stayed, and this appeal followed.

*Applicable Law*

▇▇▇ The matrix of legal principles which governs plaintiff's suit may be simply sketched. A state employee, such as plaintiff, having a liberty or property interest in his position must be accorded procedural due process.[11] Likewise, if it is established that the state seeks to discharge an employee for exercise of constitutional rights a hearing may be ordered.[12] A liberty interest arises, for example, when one is publicly subjected to a badge of infamy, such as being "posted" as a drunkard.[13] In plaintiff's context, it arises when an employee is able to demonstrate that the State has made a charge "that might seriously damage his standing and associations in his community" or that is of such a nature as to impose "a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities."[14] Such a showing is the employee's voucher of admission to the arena of procedural due process; without it such questions do not arise.[15] Moreover to raise a liberty interest such charges must be public ones; we have recently held that even charges of the most damaging nature do not do so by their mere presence in confidential files.[16] And in *Ferguson*, we recognized a place for the making of private, though damaging, charges against an employee who elects to depart rather than air them.[17] *Sims* also recognizes, however, that where such public charges are denied[18] and discharge is resisted, they may not be a basis of discharge

8. To which she swore.

9. Duke v. North Texas State University, 469 F.2d 829 (5th Circuit 1972), cert. denied, 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973); Ferguson v. Thomas, 430 F.2d 852 (5th Cir. 1970).

10. Emphasis added. At oral argument plaintiff's counsel opined that these would have to be teachers, or perhaps practitioners, of modern dance.

11. *Roth, Sindermann*, supra at note 1.

12. *Cf. Ferguson*, 430 F.2d at 858.

13. Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

14. *Roth*, 408 U.S. at 573, 92 S.Ct. at 2707; Russell v. Hodges, 470 F.2d 212, 216 (2d Cir. 1972). In the balance of our opinion we employ the term "stigmatizing charges" as a shorthand designation for such as raise a liberty interest.

15. Bradford v. Tarrant County Junior College District, 492 F.2d 133 (5th Cir. 1974).

16. Sims v. Fox, 505 F.2d 857 (5th Cir. 1974) (en banc).

17. *Ferguson*, 430 F.2d at 856.

18. And cf. Goss v. Lopez, 419 U.S. 565, 577, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

unless due process has been accorded. What process is "due" in such cases is not an open question in this Circuit. It was settled in *Ferguson*, to the appropriate portions of which we will later refer.

That the court below erred in two respects is plain. Nor, in main, are the applicable principles of law in serious doubt. As usual the difficulties arise in applying them and the awkward questions in achieving a disposition just to both sides. We commence with the simpler matters and proceed to the more complex, hoping that thus our reasons for resolving these latter as we do will be more easily apparent.

### Reconstituting the Panel

■ Having made no finding, as scarcely it could,[19] that the university hearing committee lacked apparent impartiality,[20] the court nevertheless substituted another, to be selected according to procedures of its own devising, and referred all questions to it. Such a measure wants precedent in authority and is at variance with that respect for the academic administrative process and insistence that it be permitted to run its course which are indicated in our *Ferguson* and *Duke* opinions. The court's directions apply a *per se* rule of disqualification on suspicion[21] to rend from the structure of authority the very functions which it is created to and must perform if institutional order is to obtain. This was error.

### Allegations as Establishing Facts

■ The court erred as well in its conclusion that the presence of a "liberty"

interest was established by plaintiff's allegations in her sworn complaint. All such allegations were denied by defendants' pleadings. Courts do not decide disputed matters of fact, or even contested matters of law in which subsidiary factual findings are necessarily embedded, on their merits by consulting traversed pleadings. On remand the court should consult the evidence in the record.

### Waiver

■ Dr. Kaprelian rejected the administrative procedures available and offered to pass on her complaints because their first stage did not accord her due process. Has she waived a right to the administrative process by so aborting it?

As noted in *Ferguson*, we consider that there is a valid place for essentially private and preliminary hearings of the type contemplated by the ad hoc committee procedure of the Faculty Handbook, set out at note 4 above. These, the analog of show-cause proceedings or examining trials, may provide valuable opportunities to avoid needless embarrassment or to set volatile matters in perspective.[22] We would be most loath to hold that, with or without such a preliminary hearing, no state employee could be finally[23] and constitutionally allowed to go his way without a public and adversary airing of charges, no matter how demeaning or fully admitted. Were this the law's demand, it well might be that few would accept public employment, and so bind themselves to be broken on the wheel of any future indiscretion or moral lapse which a supervisor might think mandated dismissal.

19. Since the panel has never been constituted and the court's sole possible suspicion that it might be biased stemmed from the fact that it would be appointed by Guinn. We have refused to presume a want of impartiality on facts far less mild and suppositious than these. E. g., Duke v. North Texas State University, 469 F.2d 829 (5th Cir. 1972), cited by the court below, where those who were to sit on the panel were members of an administration which had already been broadsided by the grievant in terms coarsely abusive. And cf. Jenkins v. Louisiana State Board of Education, 506 F.2d 992 (1975) and Robison v. Wichita Falls and North Texas Community Action Corp., 507 F.2d 245 (1975).

20. Ferguson v. Thomas, 430 F.2d at 856.

21. We note the court's action in this respect is contrary to our holding in *Duke, supra,* 469 F.2d at 834:

We decline to establish a *per se* rule that would disqualify administrative hearing bodies such as the President's Cabinet from hearing internal university matters solely for the reason that the members are employees of the Board and because some of them participated in the initial investigation of the incident and initiation of the cause under consideration.

22. In so noting, of course, we assume a case in which they are not used as pretexts for delay or for wearing out the grievant financially.

23. After all, the administrator is entitled to know when the matter is at an end.

Are we then to conclude that in refusing even to commence the process for reviewing discharges such as hers except upon her own supererogatory terms, Mrs. Kaprelian waived her right to procedural due process and should not now be heard to assert it? For several reasons, we think not. In the first place, the events of our case happened in 1970–71, before the law in the area had received the definitive form and guidance supplied by the Supreme Court in *Roth* and *Sindermann* and when *Constantineau* was fresh on the books and its range of application uncertain. In such circumstances, and where such precious procedural rights are involved, we would be slow to divine a waiver of them, the intentional foregoing of a known right. In the second, the procedures laid down give no sure access to procedural due process at the administrative level, being described as "final" in the event of an adverse decision by the ad hoc committee—though we doubt, in view of the present state of the law, that such a measure would be enforced, and if it were, the courthouse doors are open now, as they were then. We would not be understood to countenance the casual spurning of reasonable, even if imperfect, administrative procedures laid down in good faith, and were either above factor absent a more serious issue of waiver would be presented. For the reasons stated, however, we decline to find a waiver here and proceed with our inquiry.

### Is Due Process Required?

 It is now familiar law that non-tenured teachers such as Dr. Kaprelian may be discharged for no reason or for any reason not impermissible in itself or as applied. Exercise of First Amendment rights, unless carried to such a point as clearly to over-balance one's usefulness as an instructor,[24] is a basis of discharge intrinsically impermissible: it is advanced here however, as it was advanced below, in a manner decidedly conclusory and pro forma.[25] It may well be doubted whether a subordinate's insistence on imposing his general policy views on his superior, controlling his own teaching assignments, or publicly denigrating his college fall within these protections, but it is certain that refusing to permit him to voice and apply in his teaching academic views relevant to assignments actually given him does.

 Nor is it doubtful that such a one who is subjected to defacing public charges in or as a result of the discharge process is entitled to a due-process hearing at which he can make a fair fight to clear his name. It may be that Dr. Kaprelian is entitled to such a hearing on either or both of the above grounds; we cannot tell,[26] since the court below made no findings on the First Amendment claim and an incomplete finding on an improper basis (the allegations) as to the liberty interest. Until proper findings are made it will not be known whether due process at the administrative level was required.

On the remand which we order, the Court should determine the following:

(1) Was Dr. Kaprelian discharged for exercising First Amendment rights?

(2) Were the charges made stigmatizing, in their context, and

(3) if so, has the administration of the institution made these charges public in any official or intentional manner, other than in connection with the defense of this action?

 If the court finds in the affirmative as to (1) or as to (2) and (3), it should remand the matter to the institution for an administrative hearing on the merits of the charges, as well as upon the question, should the court have

---

24. Ferguson v. Thomas, 430 F.2d at 859.

25. The court below did not feel it necessary to make findings or arrive at conclusions on the contention, and before us little or nothing was advanced by way of argument on the point.

26. It is true we could consult the record upon which the trial court acted and attempt such a determination, but we think this inappropriate, in part because no hearing has ever been held.

found in the affirmative on (1), whether Kaprelian's ". . . exercise of [her] constitutional privileges clearly over-balanced [her] usefulness as an instructor." *Ferguson*, 430 F.2d at 859.[27] If not, it should enter judgment for defendants.

At the administrative hearing, if required, Dr. Kaprelian should be accorded at least the minimum procedural due process set out for such proceedings in *Ferguson*.[28] Should the institution wish to add to these constitutional minima it may but will not be required to do so.

Any further legal proceedings resulting from the administrative determinations will be conducted in accordance with the principles laid down in *Ferguson*.[29]

Reversed and remanded.

---

27. Given the nature and complexity of the issue in this case, we deem this an issue appropriate for initial determination by the school-constituted review body in the exercise of its academic expertise.

28. Ferguson v. Thomas, 430 F.2d at 856. We see no occasion, at this stage of the matter, for preliminary administrative action of the ad hoc committee.

29. Ferguson v. Thomas, 430 F.2d at 858.