Bryan L. **LINDSEY,** Plaintiff-Appellee,

v.

**BOARD OF REGENTS OF the UNIVERSITY SYSTEM OF GEORGIA et al.,** Defendants-Appellants.

No. 77–2265.

United States Court of Appeals, Fifth Circuit.

Nov. 28, 1979.

Rehearing Denied Jan. 2, 1980.

Alfred L. Evans, Jr., Senior Asst. Atty. Gen., Atlanta, Ga., for defendants-appellants.

R. Lawrence Dessem, Washington, D. C., J. Hue Henry, Athens, Ga., Jerry Anker, Washington, D. C., for plaintiff-appellee.

Before GODBOLD, RONEY and FRANK M. JOHNSON, Jr., Circuit Judges.

GODBOLD, Circuit Judge:

Plaintiff Lindsey is an assistant professor in the College of Education at the University of Georgia. Before the 1977–78 academic year he was employed for seven consecutive years under a series of one-year contracts. In July 1976 the university notified him that he would not be offered a contract for 1977–78. Lindsey brought this action under 42 U.S.C. § 1983, alleging that the nonrenewal was a result of his exercise of rights guaranteed to him by the First Amendment to the Constitution of the United States. After a nonjury trial the district court found that Lindsey was denied employment solely because of his exercise of First Amendment rights. The court enjoined the defendants from failing to offer Lindsey employment for the 1977–78 academic year and from any unfairness in considering Lindsey for tenure. We affirm the judgment of the district court.

In 1975 Lindsey and ten other members of the University faculty proposed a questionnaire addressed to "All Faculty, University of Georgia" containing 15 items, which are set out in the margin.[1] Each item called for a responsive rating of "low" or "high" with respect to departmental level, college level, university level and Board of Regents level. The questionnaire contained no information showing its source but said: "This anonymous questionnaire should be

---

1.
1. Your trust and faith in your leaders
2. Your leaders' trust and faith in you
3. Your leaders' acceptance of faculty participation in setting University policy
4. Your leaders' acceptance of faculty participation in establishing the administrative procedures to carry out policies
5. The extent to which good teaching is rewarded
6. Your ability to influence decisions which affect you directly
7. Your ability to influence broader policy and administrative decisions
8. How your leaders' respect your point of view
9. Fairness of decisions which affect you
10. How well decision makers seek and utilize evidence from those close to the matter under consideration
11. Your ability to supply information and make rebuttals in the judgment of your performance
12. Your leaders' sharing of information you think you should have
13. Your leaders' provision of means for dealing with grievances
14. The completeness and accuracy of information used in rating you for salary adjustment, promotion, etc.
15. The extent to which good research is rewarded

sent to: Mr. Charles Harris, Chairman, Board of Regents, Ocilla, Georgia, 31744." Lindsey had the questionnaire mimeographed by facilities of the College of Education and inserted a copy in each faculty member's mailbox.

As soon as the questionnaire was distributed the university made an investigation. Numerous events ensued. Summarizing them, police investigated whether university facilities had been used in violation of law in printing the document; Lindsey, angered because police questioned him and read him *Miranda* warnings, told the press he would not return the next year; the university took Lindsey up on his announcement and told him that since he was leaving he would not be offered a contract for the next year; Lindsey receded from his media announcement; the university then told him his contract would be renewed for the 1976–77 year.

Notice to Lindsey that his contract would not be renewed for the 1977–78 year was given in July 1976, almost a year after the events concerning the questionnaire.

■ Contrary to the university's arguments, Lindsey's actions were speech protected under the First Amendment. The questionnaire solicited the views of faculty on a broad range of issues, such as the degree of mutual confidence existing between administration and faculty, the extent to which good teaching and good research were rewarded, the extent to which faculty opinions were listened to and respected, the effectiveness of the administration in dealing with grievances, the accuracy and completeness of information used to evaluate teachers, and other matters. These are matters of public importance and concern. Comment upon them is protected speech under *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and similar cases. The Supreme Court pointed out in *Pickering* that there must be a balance between the interests of the teacher as a citizen in commenting upon matters of public concern and the interests of the state, as an employer, in promoting the efficiency of the public services it per-

forms through its employees. *Id.* at 568, 88 S.Ct. at 1734, 20 L.Ed.2d at 817. In *Pickering* a teacher wrote a letter to a local newspaper in connection with a proposed tax increase, criticizing the board of education's allocation of school funds between educational and athletic programs and methods used by the board and the superintendent of education to disseminate or conceal information regarding the real reasons why additional tax revenues were being sought. The statements were not directed toward any person with whom Pickering would normally be in contact in the course of his daily work as a teacher. Some of the statements were correct. Those that were incorrect the Court found were not per se detrimental to the schools, and the allegations of the board concerning harm were not supported by any evidence. Having concluded that any false statements were not shown to be harmful, the Court turned to the subject matter of the comments:

> [T]he question whether a school system requires additional funds is a matter of legitimate public concern on which the judgment of the school administration, including the School Board, cannot, in a society that leaves such questions to popular vote, be taken as conclusive. On such a question free and open debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.

> \*   \*   \*   \*   \*   \*

> What we do have before us is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have

interfered with the regular operation of the schools generally. In these circumstances we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public.

*Id.* at 571–73, 88 S.Ct. at 1736–37, 20 L.Ed.2d 819–20 (footnote omitted). *See also Stapp v. Avoyelles Parish School Board,* 545 F.2d 527 (CA5, 1977) (principal's criticism of school board's personnel decisions); *Kaprelian v. Texas Woman's University,* 509 F.2d 133, 139 (CA5, 1975) ("Exercise of First Amendment rights, unless carried to such a point as clearly to overbalance one's usefulness as an instructor, is a basis of discharge intrinsically impermissible"); *Smith v. Losee,* 485 F.2d 334 (CA10), *cert. denied,* 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974) (faculty member's criticism of university's personnel and administrative policies).

The university relies upon cases such as *Clark v. Holmes,* 474 F.2d 928 (CA7 1972). In *Clark* the disputes between the teacher and his superiors and colleagues concerned the content of a course he was teaching, his student counseling activities, and his belittling of other staff members in discussions with students. All of the matters except the last were held not "matters of public concern," but instead matters involving Clark as a teacher rather than as an interested citizen. The critical remarks concerning the administration and faculty were held not protected because they were found to be irresponsible and captious remarks, made to a captive audience composed of students dependent upon Clark for grades and recommendations. *Hetrick v. Martin,* 480 F.2d 705 (CA6), *cert. denied,* 414 U.S. 1075, 94 S.Ct. 592, 38 L.Ed.2d 482 (1973), concerned a discharge for classroom inadequacies of a teacher's methods. Unlike the actions at issue in *Clark* and *Hetrick,* Lindsey's questionnaire was neither a mere in-house dialogue about administrative details of no concern to the public nor an indication of the adequacy of the teaching perform-

ance of Lindsey or any other particular teacher.

■ The evidence was sufficient to support the district court's finding that the difficulty over the questionnaire was the sole reason for Lindsey's nonrenewal. The court's conclusion rested on circumstantial evidence, including the university's failure to recommend him for employment at another university, after telling him initially it would do so. The university's contention that the court could not base a decision on circumstantial evidence when there was oral testimony giving other reasons for nonrenewal is so lacking in merit that it does not require discussion.

In *Megill v. Board of Regents,* 541 F.2d 1073 (CA5, 1976), the Florida Board of Regents, after a constitutionally adequate hearing, denied tenure to Megill on the basis of six incidents. Because the district court, erroneously, reviewed only two of the grounds for dismissal, this court reviewed the complete record and found that Megill's First Amendment rights had not been infringed. The university seeks to bring itself within *Megill,* charging that Lindsey's actions were comparable to Megill's and therefore unprotected. *Megill* is distinguishable on three distinct points.

First, Megill's statements were false and inaccurate statements of fact whose truth could be easily ascertained. 541 F.2d at 1085. Lindsey's questionnaire, on the other hand, was not a statement of fact but the presentation and solicitation of ideas and opinions. Since "[u]nder the First Amendment there is no such thing as a false idea," *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805 (1974), Lindsey's actions are more deserving of First Amendment protection than were Megill's.

Second, the Supreme Court in *Pickering* drew an analogy between the dismissal of a teacher for making false statements about the Board of Education and the initiation of libel suits for defamation of public officials. 391 U.S. at 573, 88 S.Ct. at 1737, 20 L.Ed.2d at 820. This analogy suggests that false

statements made with actual malice[2] are unprotected in both situations; dismissal of a teacher for such statements is therefore acceptable under *Pickering.* The ease with which Megill could have ascertained the inaccuracy of his statements suggests that he had the requisite reckless disregard of their truth or falsity. No such conclusion could be drawn as to Lindsey's actions.

Finally, in *Megill,* the court found that the Board was motivated not by the speech itself but by the underlying character traits it evidenced. *Cf. Garza v. Rodriguez,* 559 F.2d 259, 260 (CA5, 1977), *cert. denied,* 439 U.S. 877, 99 S.Ct. 215, 58 L.Ed.2d 191 (1978) (citing *Megill* for the proposition that a public employee cannot "claim First Amendment protection for speech used against him not because of speech itself, but because the speech evidences character traits undesirable in an employee."). Here the district court found as a matter of fact that the Board was motivated specifically by Lindsey's exercise of his right of free speech.

*Mt. Healthy City Board v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), decided shortly before the district court's decision in the present case, and cited by the district court, does not change the result. *Mt. Healthy* recognized that a school board may have mixed motives in terminating or not renewing a teacher—reasons rooted in the teacher's exercise of First Amendment rights and independent reasons not to extend tenure or not to rehire. The Court held that in such a situation the burden of proof is on the Board to demonstrate that it would have reached the same decision even if the teacher had not engaged in the protected activity. The Court remanded because it could not tell whether the Board would have reached the same decision. The present case, under the district court's findings, is not a mixed motive case. Rather, the court found that the university's sole reason for nonrenewal was the questionnaire incident and that no one connected with the decision not to renew gave any consideration to the university's tenure policies.

AFFIRMED.

---

2. Actual malice is defined as "knowledge that [the statement] was false or . . . reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964).