Sheila MYERS

v.

**Harry CONNICK, Individually and in his capacity as Orleans Parish District Attorney.**

Civ. A. No. 80–4260.

United States District Court, E. D. Louisiana.

Feb. 9, 1981.

George M. Strickler, Jr., New Orleans, La., for plaintiff.

William F. Wessel, New Orleans, La., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK M. GORDON, District Judge.

This is a civil rights case in which the plaintiff contends that her employment was terminated because she exercised her constitutionally-guaranteed right of free speech. Plaintiff, Sheila Myers, was employed by the defendant, Harry Connick, as an Assistant District Attorney for Orleans Parish, Louisiana. Connick is being sued individually and in his capacity as the Orleans Parish District Attorney.

On October 7, 1980, plaintiff was fired by the defendant, Harry Connick, from her position as an Assistant District Attorney. She contends that she was fired because of a questionnaire which she circulated to her fellow Assistant District Attorneys. Myers contends that her circulation of the questionnaire was a constitutionally protected activity for which she may not be fired. Defendant asserts that the decision to terminate Myers' employment was based on her refusal to accept a transfer and was thus a lawful action.

On December 5, 1980, plaintiff's hearing on her application for a preliminary injunction was converted to a trial on the merits, a nonjury trial was held, and the matter was taken under submission. Having thoroughly reviewed the evidence, the memoranda furnished by counsel and the applicable law, the Court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### 1.

The plaintiff, Sheila Myers, was employed by the defendant, Harry Connick, as an Assistant District Attorney in the Orleans Parish District Attorney's Office. Connick is the District Attorney for Orleans Parish.

### 2.

Plaintiff occupied her position as an Assistant District Attorney for over five years. During that period she refused a number of promotion offers in order to remain in her position as a trial attorney.

All of the evidence presented at trial indicated that Myers was a competent, conscientious and effective trial attorney. She was active in programs at law schools in the City of New Orleans and participated in high school and scouting programs sponsored by the District Attorney's Office. In addition, at Judge Israel Augustine's request, plaintiff participated in a probation program for youthful first offenders in his section of court.

### 3.

The Orleans Parish District Attorney's Office assigns two or three Assistant District Attorneys as prosecutors in each section of Criminal District Court in Orleans Parish. From 1976 through October of 1980, Myers served as a prosecutor in Section A, Judge Charles Ward's section.

In October of 1980, plaintiff learned that she was being considered for a transfer to Section I of Criminal Court, Judge Israel Augustine's section. Myers was strongly opposed to the proposed transfer since she was comfortable in her position with Judge Ward and since she was reluctant to prosecute in Judge Augustine's section because of her participation in his probation program. Plaintiff was aware that conflicts of interest would arise if she were called upon to prosecute individuals for whom she had served as a counsellor in Judge Augustine's program.

### 4.

Myers spoke with several of her supervisors regarding her objections to the proposed transfer. She expressed her reservations about going to Section I to Dennis Waldron, First Assistant District Attorney, and to Training Supervisor Bridget Bane.

Myers also had occasion to discuss the matter with the defendant at a meeting she arranged with Connick and Waldron regarding the hiring of her law clerk as an Assistant District Attorney.

### 5.

On October 6, 1980, shortly after her conference with Connick and Waldron, Myers received a memorandum which indicated that she was being transferred to Section I, Judge Augustine's section. She again spoke with Dennis Waldron, expressing her reluctance to accept the transfer. During the course of this discussion, the plaintiff and Waldron discussed a number of other concerns which the plaintiff had about conditions within the office. Plaintiff testified that in response to Waldron's suggestion that her concerns were not mirrored by others within the office, she informed him that she would do some research on the areas discussed.

### 6.

After speaking with Waldron, plaintiff returned to her home for the evening. Disturbed by the transfer order, she was unable to sleep and stayed up most of the evening preparing a list of the issues which expressed her concerns about conditions in the District Attorney's Office. She enumerated these issues in a questionnaire which she prepared for distribution to her fellow Assistant District Attorneys.[1]

The next morning, October 7, Myers arrived at work at approximately 5:30 a. m. She typed the questionnaire and prepared forty copies of it.

### 7.

At approximately 8:15 a. m. that morning, the defendant discussed the transfer order with Myers. Connick testified that he had planned to take the day of October 7th off, but made a special trip into the office to discuss the transfer matter with the plaintiff. Connick urged Myers to accept the transfer and their conversation ended when Myers indicated to him that she would "consider" transferring to Section I.

### 8.

Later that same day, at approximately 11:15 a. m., Myers began to distribute copies of her questionnaire to the other Assistant District Attorneys, ensuring that only the Assistants and no clerical personnel, received copies of the questionnaire.

Plaintiff distributed the questionnaires by personally going to the offices of some Assistants and by calling others on the telephone to come by her office. Myers also distributed a number of the questionnaires

---

**1.** The questionnaire is as follows:

PLEASE TAKE THE FEW MINUTES IT WILL REQUIRE TO FILL THIS OUT. YOU CAN FREELY EXPRESS YOUR OPINION WITH ANONYMITY GUARANTEED.
* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

1. How long have you been in the Office? _____

2. Were you moved as a result of the recent transfers? _____

3. Were the transfers as they effected you discussed with you by any superior prior to the notice of them being posted? _____

4. Do you think as a matter of policy, they should have been? _____

5. From your experience, do you feel office procedure regarding transfers has been fair? _____

6. Do you believe there is a rumor mill active in the office? _____

7. If so, how do you think it effects overall working performance of A.D.A. personnel? _____

8. If so, how do you think it effects office morale? _____

9. Do you generally first learn of office changes and developments through rumor? _____

10. Do you have confidence in and would you rely on the word of:
    Bridget Bane _____
    Fred Harper _____
    Lindsay Larson _____
    Joe Meyer _____
    Dennis Waldron _____

11. Do you ever feel pressured to work in political campaigns on behalf of office supported candidates? _____

12. Do you feel a grievance committee would be a worthwhile addition to the office structure? _____

13. How would you rate office morale? _____

14. Please feel free to express any comments or feelings you have. _____
    _____
    _____
    _____
    _____
    _____
    _____

THANK YOU FOR YOUR COOPERATION
IN THIS SURVEY.

during lunch. In all, she asked seventeen Assistant District Attorneys to respond to the questionnaire. Fifteen took copies of the questionnaire, one refused to respond to it and another was unable to obtain a copy of the questionnaire prior to the subsequent events of the day.

### 9.

Shortly after noon, Dennis Waldron learned that the plaintiff was distributing the questionnaire among the Assistants in the office. Waldron immediately phoned the defendant and informed him that the plaintiff was creating a "mini-insurrection" within the office. Waldron urged Connick to return to the office, advice which was heeded.

When Connick arrived at his office, he discussed the matter with Waldron, Sergeant Frank Ruez, Chief Investigator, and Fred Harper, Co-Chief of Trials. Shortly thereafter, at approximately 2:00 p. m. that afternoon, Connick summoned the plaintiff to his office and informed her that her position with the District Attorney's Office was being terminated as of 5:00 p. m. that afternoon.

Connick told the plaintiff that she was being fired because of her refusal to accept a transfer. The defendant also informed Myers that he considered her distribution of the questionnaire to be an act of insubordination. Connick objected strongly to Question No. 10 [2] on the questionnaire which he felt impugned the integrity of the supervisors within the office, and to Question No. 11 [3] which he felt would be damaging if discovered by the press.

Prior to leaving the defendant's office, Myers offered to let Connick know what her final decision was regarding the transfer to Section I. Connick informed the plaintiff that he did not want to hear about her decision.

### 10.

Plaintiff turned in her keys to Sergeant Frank Ruez at 5:00 p. m. that afternoon. She returned to work during office hours for the next three days, arranging her files and making notes regarding the cases which she had been handling.

### 11.

The preponderance of the evidence in this case indicates that the plaintiff was fired by the defendant because of her circulation of the questionnaire within the District Attorney's Office. Although Connick informed Myers that she was being fired because of her refusal to accept a transfer, the facts in this case show that it was the questionnaire that was the real reason behind the termination of plaintiff's job.

Sheila Myers was clearly upset by her proposed transfer to Section I. She conveyed her dissatisfaction over the proposal to a number of her superiors, including the defendant. Nevertheless, when asked by the defendant on the morning of her firing to accept the transfer, she informed Connick that she would "consider" it. Connick, apparently accepting that as a satisfactory response for the time being, then left the office for the day. It was not until later that day when Dennis Waldron phoned Connick and informed him that plaintiff was causing a "mini-insurrection" by her circulation of the questionnaire that Connick made his decision to terminate Myers' employment.

Between the time of her two meetings with Connick, plaintiff said nothing to indicate that she was not considering the proposed transfer. In fact, George Ours, Jr., an Assistant District Attorney who was also being proposed for a transfer to Section I, testified that on October 7th, the plaintiff called him to her office to discuss the future assignment of their new caseload in Section I. She also gave Ours one of the question-

---

**2.** 10. Do you have confidence in and would you rely on the word of:

    Bridget Bane _____
    Fred Harper _____
    Lindsay Larson _____
    Joe Meyer _____
    Dennis Waldron _____

**3.** 11. Do you ever feel pressured to work in political campaigns on behalf of office supported candidates? _____

naires at that time. Nevertheless, Myers' discussion with Ours of their prospective caseload in Section I indicates that she was either "considering" making the transfer as she had informed Connick that she was planning to do, or that she had already decided to accept the transfer. Thus, it cannot be said that there were any new developments between the time of her morning conversation with Connick and his firing of her that afternoon that would have caused the defendant to fire her for a refusal to accept a transfer. Indeed, at the time of Myers' firing, Connick refused to allow plaintiff to tell him what her final decision was regarding the transfer.

All of the events of October 7th indicate that it was plaintiff's circulation of the questionnaire among her peers that was the basis for her firing. It was the questionnaire that prompted Dennis Waldron to telephone the defendant and it was plaintiff's distribution of the questionnaire that Waldron characterized as a "mini-insurrection." Based on his knowledge of the questionnaire and his objections to the questions presented therein, the defendant fired Sheila Myers from her position as an Assistant District Attorney. But for her circulation of the questionnaire, plaintiff's employment with the District Attorney's Office would not have been terminated.

12.

At the time of the termination of her employment, plaintiff was receiving a gross monthly salary of $2,337.84.

Myers has been unable to obtain other employment since the time of her firing. At the time of trial, she was receiving $164.00 per week from the Louisiana Unemployment Commission.

## CONCLUSIONS OF LAW

### I.

Plaintiff has filed suit under the provisions of the Civil Rights Act, 42 U.S.C. § 1983. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 1343(3).

### II.

It has been held that when public employment is at issue, one may "neither be dismissed or not be rehired for constitutionally impermissible reasons such as race, religion, or the assertion of rights guaranteed by law or the Constitution." *Ferguson v. Thomas*, 430 F.2d 852, 857 (5th Cir. 1970).

Plaintiff contends that she was dismissed from her position as a public employee because she exercised her constitutionally-guaranteed right of free speech. She submits that her distribution of the questionnaire to her fellow Assistant District Attorneys was a protected activity. The defendant, while denying that Myers' distribution of the questionnaire was the basis for her termination, contends that the distribution was not constitutionally protected.

Since a free speech question is presented by plaintiff's claim, this Court must pay particular attention to the issues set forth therein. The guarantee that one may not be dismissed from employment for the assertion of rights guaranteed by the Constitution takes on particular significance in First Amendment cases in recognition of the "public interest in having free and unhindered debate on matters of public importance—the core value of the Free Speech Clause of the First Amendment...." *Pickering v. Board of Education*, 391 U.S. 563, 573, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968).

### III.

Speech takes many forms and the defendant does not deny that Myers' distribution of the questionnaire was a form of speech. Whether her speech was entitled to constitutional protection and, if so, whether her employment may be terminated for her exercise of that right are the issues at the heart of this case.

Plaintiff's burden of proof in this case is: (1) to show that her conduct was constitutionally protected, and (2) to show that this conduct was a "substantial" or "motivating factor" in the termination of her employment. Once plaintiff has carried that bur-

den, the burden then shifts to the defendant to prove by a preponderance of the evidence that he would have terminated plaintiff's employment even in the absence of her protected conduct. *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

## IV.

The Court's first concern is to determine whether or not plaintiff's distribution of the questionnaire was a constitutionally protected activity.

The leading decision in this regard is *Pickering v. Board of Education, supra,* in which the United States Supreme Court held that "statements by public officials on matters of public concern must be afforded First Amendment protection" even though the statements may be directed at the public officials' "nominal superiors." 391 U.S. at 574, 88 S.Ct. at 1737. In *Pickering,* the court determined that public statements, printed in a local newspaper, by a school teacher, which were critical of the School Board and the district superintendent for their allocation of school funds and for the way in which they handled tax increase proposals, were constitutionally protected since they dealt with matters of "legitimate public concern." 39 U.S. at 571, 88 S.Ct. at 1736.

Subsequent to its decision in *Pickering,* the Supreme Court held that *private* expression by a public employee may also fall within the bounds of constitutional protection. In *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), constitutional protection was extended to private statements, made by a schoolteacher to the principal of the school to which she was assigned, which were critical of policies and practices of the school district which she deemed to be racially discriminatory.

Thus, it matters not in the instant case that the plaintiff chose to submit her questionnaire through private, rather than public, channels. In the appropriate circumstances, her speech as a government employee may be entitled to constitutional protection.

## V.

Making the determination as to the protected nature of Myers' expression requires a balancing "between the interests of the [employee] as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education* 39 U.S. at 568, 88 S.Ct. at 1734; *Lindsey v. Board of Regents,* 607 F.2d 672, 674 (5th Cir. 1979).

The test has also been characterized as involving a determination of "whether a public employee's statements unduly interfere with the efficiency with which governmental services are provided." *Bickel v. Burkhart,* 632 F.2d 1251 (5th Cir. 1980.)[4]

In the instant case, this Court must balance the interests of Myers, as a citizen, in commenting upon matters of public concern with the interest of the District Attorney in promoting the efficiency of the public services performed by his Assistant District Attorneys. Myers' speech is entitled to constitutional protection unless it substantially and materially or unduly interferes with the effective operation of the District Attorney's Office.

## VI.

In evaluating the interests of Myers in commenting upon matters of public con-

---

4. The inquiry has also been posited as one of whether or not the employee's exercise of constitutional privileges "clearly over-balanced" the employee's "usefulness" as an employee. *Kaprelian v. Texas Woman's University,* 509 F.2d 133 (5th Cir. 1975), citing *Ferguson v. Thomas,* 430 F.2d 852, 859 (5th Cir. 1970). In *Smith v. United States,* 502 F.2d 512, 517 (5th Cir. 1974) it was held that "in order for the government to constitutionally remove an employee for exercising the right of free speech, it is incumbent upon it to clearly demonstrate that the employee's conduct substantially and materially interferes with the discharge of duties and responsibilities inherent in such employment."

cern, it is appropriate to consider the nature of her expression. See, *Williams v. Board of Regents*, 629 F.2d 993 (5th Cir. 1980). In *Pickering v. Board of Education, supra*, the Court determined that the employee's speech was entitled to constitutional protection because it dealt with a matter of "legitimate public concern" [5] 39 U.S. at 571, 88 S.Ct. at 1736.

A review of the contents of Myers' questionnaire convinces this Court that the issues presented therein are matters of public concern. Plaintiff solicited the views of her fellow Assistant District Attorneys on a number of issues, including office transfer policies and the manner in which information of that nature was communicated within the office. The questionnaire also sought to determine the views of Assistants regarding office morale, the need for a grievance committee, and the level of confidence felt by the Assistants for their supervisors. Finally, the questionnaire inquired as to whether the Assistants felt pressured to work in political campaigns on behalf of office-supported candidates.

Taken as a whole, the issues presented in the questionnaire relate to the effective functioning of the District Attorney's Office and are matters of public importance and concern. Myers' expression constitutes protected speech.

## VII.

Myers' interests must be balanced with the interest of the State in the effective and efficient operation of the District Attorney's Office. For the "balance to be struck in favor of a governmental employer, the government must 'clearly demonstrate that the employee's conduct substantially interferes with the discharge of duties and responsibilities inherent, in [governmental] employment.'" *Schneider v. City of Atlanta*, 628 F.2d 915, 919, n. 4 (5th Cir. 1980), citing *Smith v. United States*, 502 F.2d 512, 517 (5th Cir. 1974).

■ Appropriate factors to be taken into consideration in evaluating the State's interest in limiting its employees' right to speak freely are: "(1) the need to maintain harmony among co-workers; (2) the need for confidentiality; (3) the need to curtail conduct which impedes the [employee's] proper and competent performance of his daily duties; and (4) the need to encourage a close and personal relationship between the employee and his superiors, where that relationship calls for loyalty and confidence." *Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir. 1972), cert. *denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973). See, *Williams v. Board of Regents*, 629 F.2d 993 (5th Cir. 1980.) While not an all-inclusive list, a consideration of the aforementioned factors is a relevant inquiry.[6]

No breach of confidentiality is asserted in regard to plaintiff's distribution of the questionnaire. Defendant does, however, contend that plaintiff's use of the office's copying equipment violated office policy and that her distribution of the questionnaire during work hours impeded the per-

---

5. In *Pickering*, the court upheld a schoolteacher's right to comment upon school board policies regarding a tax increase proposal and the allocation of funds between athletic and educational programs.

In *Lindsey v. Board of Regents, supra*, the court determined that a university professor's submission of a questionnaire to fellow faculty members regarding the university administration's methods of dealing with the faculty was a matter of "public importance and concern." 607 F.2d at 674.

Other examples of protected speech include: Fireman's criticism of fire department policies, offered at a private meeting arranged by the department. *Bickel v. Burkhart*, 632 F.2d 1251 (5th Cir., 1980.) High school teacher's classroom discussion of post-Civil War American

history, discussion which was objected to by the school district because it evoked strong student feelings on racial issues, was deemed to be constitutionally protected speech. *Kingsville Indep. School District v. Cooper*, 611 F.2d 1109 (5th Cir. 1980).

6. An important, albeit obvious, observation must be made. The mere fact of objection by the defendant to the plaintiff's distribution of the questionnaire carries no weight in regard to the propriety of the termination of Myers' employment. All of the cases cited herein necessarily involve instances in which an employer objected to his employee's speech. The Court must make the determination of the legality of the employer's objections.

formance of her duties. Defendant has failed to carry his burden of proof in this regard.

Connick has offered no evidence from which this Court might conclude that plaintiff's use of the office copying equipment violated office policy. Moreover, even had such evidence been offered, this Court could not conclude that such an act carries much weight in regard to striking a balance in the State's favor.

Similarly, the defendant's contention that plaintiff's distribution of the questionnaire constituted an impediment to the performance of her duties is of little effect. Connick has not shown any evidence to indicate that the plaintiff's work performance was adversely affected by her expression. Myers occupied a professional position. Some latitude in regard to the times during which she performed her work was inherent in her position as an Assistant District Attorney. There is no evidence to indicate that plaintiff was anything other than a hardworking, conscientious attorney who fulfilled the requirements imposed upon her by her job.

The defendant's most forceful argument relates to the State's need to encourage a close and personal relationship between Myers and her superiors. Connick argues that Question No. 10, which asked whether or not the Assistants had confidence in and relied on the word of five named supervisors, impugned the integrity of the plaintiff's supervisors and adversely affected plaintiff's working relationship with them.

While it is important to the efficient and successful operation of the District Attorney's Office for Assistants to maintain close working relationships with their superiors, it cannot be said that plaintiff's distribution of the questionnaire adversely affected her relationship with her superiors. Unlike a statement of fact which might be deemed critical of one's superiors, plaintiff's questionnaire was "not a statement of fact but the presentation and solicitation of ideas and opinions." *Lindsey v. Board of Re-*

*gents,* 607 F.2d at 675. As in *Lindsey,* plaintiff's submission of the questionnaire is more deserving of First Amendment protection than a statement of fact would be, "since 'under the First Amendment there is no such thing as a false idea.'" *Lindsey v. Board of Regents, supra* at 675, citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805 (1974).

When all factors are considered, it cannot be said that the defendant's interest in promoting the efficiency of the public services performed through his employees was either adversely affected or substantially impeded by plaintiff's distribution of the questionnaire. Any objections which the defendant had regarding plaintiff's expression were not of such magnitude as to constitute either a "substantial and material interference" with plaintiff's discharge of her duties or to "unduly interfere" with the services provided by the District Attorney's Office.

Plaintiff's distribution of the questionnaire constituted protected speech. When Myers' interests, as a citizen, in commenting upon matters of public concern are balanced with the interest of the District Attorney, as an employer, in promoting the efficiency of the public services performed through its employees, the balance must be struck in favor of the plaintiff. Plaintiff has successfully met her burden of showing that her conduct was constitutionally protected.

## VIII.

Plaintiff's second burden is to show that her distribution of the questionnaire was a "substantial" or "motivative factor" in the termination of her employment. This Court has already found that plaintiff's distribution of the questionnaire was the reason for her firing by the defendant.[7] Coupled with the conclusion that plaintiff's distribution of the questionnaire was constitutionally protected, this Court must now conclude that the plaintiff has successfully met her burden of showing that her consti-

7. See Findings of Fact, Section 11.

tutionally protected conduct was a "substantial" or "motivating factor" behind the defendant's termination of her employment as an Assistant District Attorney.

## IX.

Once the plaintiff has shown that her conduct was constitutionally protected and that the conduct was a substantial or motivating factor in the termination of her employment, the burden shifts to the defendant to prove by a preponderance of the evidence that he would have terminated plaintiff's employment even in the absence of her protected conduct. The defendant has failed to carry his burden in this regard. As stated in this Court's Findings of Fact, Section 11, "[b]ut for [plaintiff's] circulation of the questionnaire, [her] employment with the District Attorney's Office would not have been terminated." Plaintiff would not have been fired in the absence of her protected conduct.

## X.

The plaintiff has sued the defendant, Harry Connick, both individually and in his capacity as District Attorney for Orleans Parish. Connick derives his authority as District Attorney from Article V, Section 26 of the Louisiana Constitution of 1974.

There has been no evidence presented to indicate that Connick was acting in any manner other than in an official capacity at the time that he terminated plaintiff's employment. Thus, any judgment against the defendant and in plaintiff's favor can only extend to the defendant in his official capacity as the Orleans Parish District Attorney. Defendant has incurred no personal liability.

### Relief

The defendant, Harry Connick, while acting in his official capacity, dismissed plaintiff, Sheila Myers, from her position as an Assistant District Attorney in violation of her right of free speech. Accordingly, the following relief is appropriate.

### Injunctive Relief.

Plaintiff is seeking injunctive relief in the form of reinstatement to her position as an Assistant District Attorney.

Considering the acrimonious circumstances surrounding plaintiff's departure from the District Attorney's Office and the adverse feelings necessarily engendered by her resort to judicial remedies, the Court feels that it will inevitably be difficult for plaintiff to achieve a harmonious working relationship within the District Attorney's Office, if she returns. Nevertheless, in view of this Court's conclusion that the termination of plaintiff's employment was unlawful, injunctive relief is appropriate. Plaintiff is entitled to return to her position as an Assistant District Attorney for Orleans Parish.

### Back Pay.

Plaintiff is entitled to recover full back pay from the date of her wrongful termination, October 7, 1980, to the date of her effective reinstatement, less all amounts received as unemployment compensation.

### Compensatory Damages.

Plaintiff is also entitled to recover compensatory damages for the mental and emotional distress which she suffered from the loss of her job. Plaintiff testified that her Assistant's position was the only job that she had ever held as an attorney and that her loss of that job was a source of embarrassment to her. The Court finds that the plaintiff is entitled to an award of $1,500.00 in compensatory damages for the emotional and mental distress which she sustained.

### Costs and Attorney's Fees.

In light of her recovery, plaintiff is entitled to an award for costs and reasonable attorney's fees incurred in this action.

### Other Relief Requested.

Plaintiff has also sought declaratory relief and an award for punitive damages.

The Court finds that declaratory relief is inappropriate in the instant case. Similarly, punitive damages cannot be awarded since the defendant neither acted with malice nor reckless and wanton disregard for plaintiff's civil rights.

IT IS THEREFORE ORDERED that judgment be entered in accordance with this opinion, in favor of the plaintiff, Sheila Myers, and against the defendant, Harry Connick, in his official capacity as the Orleans Parish District Attorney.