Jimmie McBEE, et al.,
Plaintiffs-Appellees,

v.

JIM HOGG COUNTY, TEXAS and Gilbert Ybanez, Defendants-Appellants.

Javier Alfonso HINOJOSA, et al., Plaintiffs,

v.

JIM HOGG COUNTY, TEXAS, et al., Defendants.

No. 81–2465.

United States Court of Appeals,
Fifth Circuit.

April 30, 1984.

1010

Richard R. Gonzales, Hebbronville, Tex., Donato D. Ramos, Laredo, Tex., for defendants-appellants.

Pope, Pope, Guerrero, Guerrero & Reed, Roger Reed, Rio Grande City, Tex., for plaintiffs-appellees; Rick Fancher, Corpus Christi, Tex., of counsel.

Christopher J. Roy, Alexandria, La., Paul R. Baier, Baton Rouge, La., for amici curiae certain former deputy sheriffs of Natchitoches.

Before CLARK, Chief Judge, BROWN, GEE, RUBIN, GARZA, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM and DAVIS, Circuit Judges.

GEE, Circuit Judge:

Today we consider what constitutional restraints burden the freedom of a local elected official to reappoint subordinates of his defeated opponent—or to decline to do so.

### Facts and State Law

We reiterate only such facts, set out at length in the panel opinion,[1] as are necessary to an understanding of our resolution of the issue.

**1.** 703 F.2d 834 (5th Cir.1983).

**2.** Under Texas law, deputy sheriffs are the creatures of the sheriff, serving at his pleasure and departing with him at the end of his term. Tex.Civ.Stat.Ann. art. 6869 (Vernon 1960); *Trinkle v. State*, 59 Tex.Cr.R. 257, 127 S.W. 1060 (1910); *White v. Thomas*, 660 F.2d 680 (5th Cir.1981).

In Jim Hogg County, lying in rural South Texas and boasting a population of less than 6,000, nomination in the Democratic primary is tantamount to election to local office. Just over three years ago, Gilbert Ybanez embarked on his statutory four-year term as duly elected sheriff there. Although he offered to reappoint some of his predecessor's employees to positions in his administration, he made no such offer to the five plaintiff-appellant deputy sheriffs.[2] Instead, he followed the established custom in the county of making place for his own political supporters at the expense of Deputies Contreras, Hinojosa, Serna and Spencer, the first three of whom actively supported his predecessor's primary campaign against Ybanez. He withdrew an unaccepted offer to retain Deputy McBee in a lesser position than that she had held under his predecessor after she complained to county authorities about the "unfairness" of Ybanez's actions toward her former colleagues. This civil rights action followed.

### Procedural History

The trial court, concluding that the Supreme Court decisions in *Elrod*[3] and *Branti*[4] applied as fully to public employment decisions based on personal support of an individual Democrat as to those based on party affiliation, determined that Ybanez's attempted justifications for failing to reappoint Contreras, Hinojosa and Serna were pretextual afterthoughts offered to justify his actions based on patronage.[5] It further concluded that, under *Branti*, the next relevant inquiry was whether political loyalty to Ybanez had been shown by him to be an appropriate qualification for the office of deputy sheriff, finding that it had not. As to Mrs. McBee, the court determined that

**3.** *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

**4.** *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

**5.** None of any nature was offered as to Spencer. A claim of physical deficiency was offered as to Contreras and reservations arising from separate shooting incidents as to the other two.

she had been discharged for her protected expressions on a question of public interest: the wholesale release of former employees for political reasons. *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). So holding, the court granted substantial relief to all plaintiffs. On appeal, a panel of our court reversed, holding that the close working relations and mutual confidence demanded by service in such a small county office placed the four discharged deputies within an exception to *Elrod/Branti*, that the trial court's holdings as to the reasons for their discharge were clearly erroneous, and that the protests of Mrs. McBee to higher authority were so destructive of the close working relationship with the sheriff necessary to satisfactory performance of her job as to be unprotected. For reasons to be stated, some grounded in authority unavailable to the trial court or our panel, we vacate and remand.

### Supreme Court Authority

■ Building on earlier decisions that forbade limiting constitutional rights as a condition of awarding a governmental benefit,[6] a plurality of the Supreme Court addressed the specific issue of patronage discharges of public employees in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), a "wide-ranging opinion." *Id.* at 374, 96 S.Ct. at 2690 (Stewart, J., specially concurring). Justices Stewart and Blackmun—necessary votes in support of the judgment—joined only because, in their stated view, a "nonpolicymaking, non-

confidential governmental employee [cannot] be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." *Ibid.* This prohibition, absolute in tone, was supported only by citation to Justice Stewart's opinion for the Court in *Perry*, which likewise speaks in unqualified terms.[7] To be sure, the *Elrod* plurality paid its respects to the notion that "the prohibition on encroachment of First Amendment protections is not an absolute." 427 U.S. at 360, 96 S.Ct. at 2683. When it came to stating the terms upon which such encroachments would be condoned in the context of public employment, however, its language was such that the reader might have been pardoned for concluding that he stood in the presence of a creature more rare even than the ordinary, garden-variety, compelling state interest:

> In short, if conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights.

427 U.S. at 363, 96 S.Ct. at 2685.

In the face of such language, taken together with that of Justice Stewart's special concurrence, many courts took the *Elrod* prohibition to be virtually absolute,[8] inquiring only whether a public employee's "exercise of his speech rights was a signifi-

---

**6.** *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

**7.** For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a

person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460, 1473. Such interference with constitutional rights is impermissible.
408 U.S. at 597, 92 S.Ct. at 2697.

**8.** *E.g., Guerra v. Roma Independent School District,* 444 F.Supp. 812 (S.D.Tex.1977), and cases collected therein at 819.

cant basis for his discharge." *Stapp v. Avoyelles Parish School Board,* 545 F.2d 527, 534 (5th Cir.1977).

But if lower courts were perhaps justified in taking the foregoing exception to *Elrod*'s rule with a grain of salt, another of a more practical nature was stated by the plurality opinion: that for policymaking employees. The language employed here makes plain that it is to be taken seriously:

> A second interest advanced in support of patronage is the need for political loyalty of employees, not to the end that effectiveness and efficiency be insured, but to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate. The justification is not without force, but is nevertheless inadequate to validate patronage wholesale. Limiting patronage dismissals to policymaking positions is sufficient to achieve this governmental end. Non-policymaking individuals usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party.

427 U.S. at 367, 96 S.Ct. at 2687. And so, as to Court authority directly significant for present purposes, the matter rested until 1980, when *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574, was handed down.

While *Elrod* concerned Republicans purged from a large, metropolitan sheriff's office merely because of their national political affiliation, *Branti v. Finkel* comes closer home in some respects to our present concerns. Finkel and a colleague, Tabakman, were two of nine assistant public defenders to be purged (as Republicans), although competent workers, to make place for Democrats by the Fathers of a suburban New York county. Upholding an injunction against the proposed purge, the

Court—this time by 6–3 majority—cast further light on its *Elrod* rule and narrowed the "policymaking" exception to it.

In the course of rejecting a contention that *Elrod* prohibits only dismissals resulting from an employee's refusal to submit to a demand to *change* his political affiliation, Justice Stevens appeared to narrow the *Elrod* rule significantly. The first and more important of these articulations, for today's purposes, is the injection at two points into the Court's statement of the *Elrod* rule of the adjective "private" as modifying "political beliefs" 445 U.S. at 515, 517, 100 S.Ct. at 1293, 1294. Since whether or not the beliefs of the *Elrod* plaintiffs were private or public that opinion does not say, we can only read this restatement of the rule there laid down as a significant limitation upon it.[9]

In addition to articulating the *Elrod* rule in a narrower form, the *Branti* court restated and narrowed the significant exception made to it by the *Elrod* plurality:

> It is equally clear that party affiliation is not necessarily relevant to every policymaking or confidential position. The coach of a state university's football team formulates policy, but no one could seriously claim that Republicans make better coaches than Democrats, or vice versa, no matter which party is in control of the state government. On the other hand, it is equally clear that the Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments. In sum, the ultimate inquiry is not whether the label "policymaker" or "confidential" fits a particular position; rather, *the question is whether the hir-*

---

9. The second possible narrowing articulation is the ambiguous use in a quotation, from a mere statement of the pleadings in *Elrod,* of the term "solely": "To prevail in this type of action it was sufficient, as *Elrod* holds, for respondents to prove they were discharged 'solely for the rea-son that they were not affiliated with or sponsored by the Democratic Party.'" 445 U.S. at 517, 100 S.Ct. at 1294, quoting *Elrod,* 427 U.S. at 350, 96 S.Ct. at 2678. Would something less be "sufficient"?

*ing authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.*

445 U.S. at 518, 100 S.Ct. at 1295 (emphasis added).

Such was the state of direct Supreme Court authority at the time of the trial court's decision and at or about that of the panel opinion in today's case. Around the time of the latter, however, the Supreme Court handed down its most recent opinion treating of public employment and the First Amendment, *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

Sheila Myers, an assistant state prosecutor in the substantial Orleans Parish, Louisiana, office, objected to an internal transfer within the office and prepared and circulated among her colleagues a "questionnaire" impliedly critical of office transfer policy and other aspects of its operation. As a result, she was discharged forthwith. Finding that Ms. Myers' questionnaire constituted protected speech on a matter of public concern, the trial court gave judgment for her, 507 F.Supp. 752 (E.D.La. 1981), and we affirmed. 654 F.2d 719 (5th Cir.1981). In an opinion by Justice White, the Supreme Court reversed.

The opinion focuses primarily on the Court's 1968 *Pickering* decision, one that requires a case-by-case balancing of the interest of the public employee, as citizen, in commenting upon matters of public concern, against that of the state, as his employer, in promoting employee efficiency in public service. *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Examining Ms. Myers' questionnaire, set out in an appendix to the opinion, the Court concluded that most of its inquiries relating to internal office matters were mere extensions of her dispute

over her transfer and not—merely because they pertained to the operation of a government office—matters of public concern. One, however, did touch upon such a concern: that which inquired whether any assistant district attorney felt pressured to support office-approved candidates in political campaigns.[10] Since it did, the Court turned to the *Pickering* balance, observing—in terms critical to today's case— "that the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression." 461 U.S. at —, 103 S.Ct. at 1691–92, 75 L.Ed.2d at 722.

Faithfulness to our task demands a careful analysis of the Court's expressions in *Connick.* These commence by strongly emphasizing the government's legitimate interest in maintaining proper discipline in the public service, to the end that its duties may be discharged with efficiency and integrity. 461 U.S. at —, 103 S.Ct. at 1691, 75 L.Ed.2d at 722. Among the factors next taken up by the Court's discussion are these: (1) Whether the employee's expressions under examination impeded his ability to perform his duties—noticing, as a significant factor in that overall analysis, the effect of those expressions on his working relationship with his superiors; (2) the degree to which the employee's expressions involved matters of public concern and the gravity of that concern; (3) the time, place and manner of the expressions; and (4) the employee's motives in voicing the expressions at issue and their context. Making an independent constitutional judgment on the facts of *Connick,*[11] the Court concluded that Ms. Myers' distribution of the questionnaire did not impede her ability to do her work, that it did disrupt working relationships, that the time, place and manner of distribution—at the office, partly during work hours—were such as to interfere with

---

10. The Court here cited *Branti* and *Elrod* for the proposition that official coercion of belief violates fundamental rights and other authorities to the effect that governmental service should depend on performance rather than political service. *See Connick,* 461 U.S. at —, 103 S.Ct. at 1691, 75 L.Ed.2d at 721.

11. 461 U.S. at — n. 10, 103 S.Ct. at 1692, n. 10, 75 L.Ed.2d at 722, n. 10 and authorities collected there.

operations, and that the act threatened Mr. Connick's authority to run his office. Further observing that Ms. Myers' questionnaire touched on matters of public concern in a most limited sense and implicated the First Amendment to a correspondingly limited degree, the Court concluded that her discharge was permissible. Finally, it reiterated *Pickering*'s caveat that

> "Because of the enormous variety of fact situations in which critical statements by ... public employees may be thought by their superiors ... to furnish grounds for dismissal, we do not deem it either appropriate or feasible to lay down a general standard against which all such statements may be judged."

461 U.S., at ——–——, 103 S.Ct., at 1694, 75 L.Ed.2d, at 724–5.

### The Balancing Test

■ Surveying the Supreme Court authority which we have discussed, we conclude that the standard to be applied by us in resolving such public employee discharge or nonrenewal cases as this is the *Pickering* balancing test. Each case must be considered on its particular facts, sifting through such factors and circumstances as the *Connick* Court outlined in order to strike the proper balance between the employee's speech and associational rights as citizen and the state's right as an employer to loyal and efficient service. Such cases might reasonably be expected to locate themselves on a spectrum; we conclude that they do.

*Elrod* and *Branti*, we think, lie at the extreme of the employee's side, where little, if any, weighing is called for. There employees who were, it appears, both loyal and effective [12] were discharged on the sole ground of their private and—for employ-

ment purposes—all but abstract political views. They did not campaign, they did not even speak: they merely thought. No countervailing considerations appear; they suffered discharge for pure political beliefs, a circumstance that explains the comparative absence of "weighing" terminology in these opinions.[13]

Toward the other extreme fall such situations as were presented in our decisions of *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir.1970), and *Duke v. North Texas State University*, 469 F.2d 829 (5th Cir.1972), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973), where instructors had incited student disturbances that were sufficiently serious to call in question the ability of the academic authorities to maintain order on campus. Writing in *Ferguson*, Judge (now Chief Judge) Clark observed:

> Here the proof before the district court showed that Dr. Ferguson exercised his rights of speech and association to such an extent as to seriously impair, if not to destroy, his effectiveness as an instructor in an organized program of academic tutoring. This was his choice to make. The college had no right to control his speech or to curtail his freedom of association, but they did have a right to terminate his employment as a classroom instructor at the point where the exercise of his constitutional privileges clearly over-balanced his usefulness as an instructor.

430 F.2d at 859.

The facts of *Connick*, which locate Ms. Myers' situation more centrally on the spectrum, called forth a reiteration and application by the Court of the *Pickering* balance; and so it is with today's case.

---

**12.** *See Elrod,* 427 U.S. at 365, note 18, 96 S.Ct. at 2685, note 18:

"It does not appear that efficiency and effective government were the concerns of elected officials in this case...."

**13.** Supporting this characterization of *Elrod* and *Branti* is the *Connick* Court's characterization of these cases as standing for the rather basic proposition that:

"Official pressure upon employees to work for political candidates not of the worker's own choice constitutes a coercion of belief in violation of fundamental constitutional rights," 461 U.S. at ——, 103 S.Ct. at 1691, 75 L.Ed.2d at 721, *citing Branti*, 445 U.S. at 515–16, 100 S.Ct. at 1293–94, and *Elrod.*

■ None of the plaintiffs is situated as were the *Elrod* employees. Undisputed findings of the trial court establish that two of the plaintiffs, Deputies Spencer and Contreras, did not ask to be rehired by the new sheriff. Although the fact that the deputies were terminated by a "failure to rehire" rather than a "dismissal" [14] is irrelevant to the question of whether they were impermissibly terminated for exercising First Amendment rights, *Branti*, 445 U.S. at 513, note 6, 100 S.Ct. at 1292, note 6,[15] the failure of these deputies to request rehire does raise a more basic question: Were they applicants for the job? Put another way, must a new sheriff consider for appointed positions ex-employees who do not seek reinstatement? The First Amendment imposes no such obligation.

Moreover, three of the plaintiffs—Deputies Contreras, Hinojosa and Serna—appear to have put their political beliefs *into* action to a greater extent than the employees in *Elrod* (or *Branti*). The trial court found, and it is not contested, that these three deputies actively supported the re-election campaign of Ybanez' predecessor, Sheriff Ramirez, by displaying bumper stickers on their vehicles and attending local political rallies. Plaintiff McBee apparently took little part in the election but was effectively terminated for her complaints to the county authorities.[16]

On the other hand, this is not a *Ferguson* situation either. Ybanez does not argue that plaintiffs' political activities "clearly over-balanced their usefulness" in their positions—indeed, he argued that they were not fired for their political activity, but for inadequate performance.[17] The trial court found that "the employment decisions made by ... Ybanez were based entirely upon *his perceptions as* to the extent of prospective employee's support for and loyalty to him ...." (emphasis added.) Since plaintiffs were not rehired, there is no evidence that their previous political activity actually interfered with the effective performance of their jobs, as there was in *Ferguson.*

### Adjusting The Earlier Tests

Writing with the benefit of *Connick,* we determine that the appropriate test for a mid-spectrum situation such as this appears to be is the *Pickering* balance. *Connick,* however, is a new guidepost: both the district court and the panel had to find their way without its direction.

As noted above, the district court first determined that plaintiffs had proved that they were terminated for patronage reasons. Next, the court concluded that, for the purposes of First Amendment analysis, personal support for an individual candidate should be treated the same as national political affiliation. Finally, the court weighed the plaintiffs' interest in freedom of belief and association against Ybanez' expressed interest in hiring loyal employees. Applying the reasoning in *Branti* which redefined the *Elrod* "policymaking/confidential" exception in terms of effective performance, the trial court reasoned that Ybanez' interest in loyalty would constitute a legitimate government interest in effective service only if loyalty to a particular candidate was necessary for the effective performance of the job. The trial court determined that there had been no showing that the political beliefs or activity of the deputies interfered with the effective performance of their duties; that Ybanez had not shown that political loyalty was in any way relevant to the dispatchers' jobs; and that the small size of the office did not warrant departure from our determination in *Barrett v. Thomas,* 649 F.2d 1193 (5th Cir.1981), that political loyalty

14. See note 2 *supra.*

15. *See Perry,* 408 U.S. at 597–99, 92 S.Ct. at 2697–98 (expectations of continued employment irrelevant to First Amendment inquiry).

16. Plaintiff Spencer apparently supported McBee's protests to some extent.

17. Ybanez later conceded that his appointees were no more qualified than the plaintiffs; the trial court found Ybanez' appointees "definitely less qualified."

was not required for the effective performance of the duties of employees in a sheriff's office. *Id.* at 1200–01.

Reversing, the panel held that the small size of the office did distinguish this case from *Barrett:* that because of the small size of the staff the plaintiffs' positions "f[e]ll within the 'policymaking, confidential' exception to the *Elrod/Branti* rule," 703 F.2d at 839, 842.[18]

We find the categorical approaches of the district court and the panel problematic in view of *Connick*'s direction to tailor the analysis to the particular facts of each case. *Connick* rejects affording an employee complete freedom of speech or none at all depending either on his position or any other single factor. As we recently stated in *Gonzalez v. Benavides,* 712 F.2d 142 (5th Cir.1983), *Connick* is an "effort to avoid formulaic response" in public employee First Amendment cases. "First Amendment issues presented by speaking employees are not answerable by mechanical formulae; courts must engage in a weighing exercise, giving 'full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public.'" 712 F.2d at 147, *quoting Connick,* 461 U.S. at —, 103 S.Ct. at 1692, 75 L.Ed.2d at 722.

*Connick,* and *Gonzalez* following it, read *Pickering* to require a comprehensive but flexible analysis—a balance which weighs the particular aspects of the government's interest in effective service and the plaintiffs' interest in freedom of speech that arise in each fact situation. While *Con-*

*nick* does not overrule our three-step analysis for public employee First Amendment cases laid out in *Tanner v. McCall,* 625 F.2d 1183, 1190 (5th Cir.1980)—applied by the trial court and the panel here—it does mandate a more expansive and particularistic approach than that applied below to the first *Tanner* question: Assuming plaintiffs' allegations to be true, is the defendant's conduct an impermissible infringement of First Amendment freedoms? We turn now to the question of what factors should be weighed in today's case.

### Pickering Applied

■ While *Pickering* and its progeny do not prescribe a fixed set of factors, *Gonzalez,* 712 F.2d at 147,[19] the cases do provide guidelines and examples.[20]

The inquiry followed in *Connick* exemplifies the sort of balancing appropriate on remand. On the one hand, the court should consider to what degree the deputies' participation in the election campaign or Ms. McBee's actions involve "public concerns." On the other, the court should consider whether "close working relationships are essential to fulfilling [the deputies'] public responsibilities," *Connick,* 461 U.S. at —, 103 S.Ct. at 1692, 75 L.Ed.2d at 723. We caution that the "closeness" of a working relationship as it affects job performance is not to be gauged merely by the size of the office or the number of employees. Rather, it is a function of the particular "public responsibility" being carried out. "Close working relationships" may be less rele-

---

**18.** The panel determinations were automatically vacated by our grant of en banc consideration. In order that the district court may act with a completely free hand in applying this opinion, we vacate its findings also.

**19.** *Gonzalez* involved the dismissal of the executive director of a community action agency for publicly denying that the county commissioner's court had supervisory authority over the job performance of his subordinate and himself. In concluding that the firing impermissibly contravened the First Amendment, the trial judge considered each of the four specific factors which the *Pickering* Court weighed in balancing the employee's freedom of speech and association

against the government's interest in effective public service in that case: (1) the intimacy of the working relationship; (2) the truth or falsity of the statements; (3) the effect on the employee's work group; and (4) the abstract or personal nature of the statements. *See Gonzalez,* 712 F.2d at 146. Guided by *Connick,* we remanded for the trial court to expand its analysis to include other potential governmental interests raised by the particular facts of *Gonzalez* among those weighed in the *Pickering* balance, *id.* at 147–150.

**20.** We do not suggest, nor did the Court, that the factors enumerated in *Pickering* are meant to be exclusive of all others.

vant to the effectiveness of a five-man, one-room Motor Vehicle Bureau than they are to the effectiveness of a 50-officer police precinct, for example. Should the court find "close working relationships" "essential," it must then determine whether the particular speech sufficiently disrupted the working relationship as to prevent effective performance, requiring a stronger showing of disruption as the employees' speech moves closer to core "public concerns." *Id.*

Relevant to the determination of disruptive effect is the time, place and manner of the political activity. The *Connick* court, for example, noted that the employee in that case used work time and work space, commenting that employee speech that did not do so "might lead to a different conclusion." 461 U.S. at ——, n. 13, 103 S.Ct. at 1693, n. 13, 75 L.Ed.2d at 724, n. 13.

Finally, the court should consider whether, taken in context, the particular activity could be considered sufficiently hostile, abusive or insubordinate as to disrupt significantly the continued operation of the office. 461 U.S. at ——, 103 S.Ct. at 1693, 75 L.Ed.2d at 724. In this connection, to the extent that the district court's analysis suggests that as a matter of law it will never be relevant to First Amendment inquiry whether the speech involved constitutes personal as distinguished from party political support, it stands corrected by *Connick* and *Gonzalez. Cf. Gonzalez,* 712 F.2d at 148 (even where no intimate working relationship exists, an appointed senior official's public disavowal of the authority of his superiors may constitute such disruption as to outweigh his First Amendment right in that speech). Nor need the character of the expressions be ignored: the Constitution has not repealed human nature; and it is one thing to work with a subordinate who has expressed a reasoned preference for another superior and quite another to have forced on one's organization an

individual who has blackguarded one's honesty and ability up and down the county.

To conduct the particularized inquiry mandated by *Connick* in this case will require evaluation of the record with these considerations in mind and may require further development of the facts. This is a task better suited to the district court than to consideration by us en banc. Accordingly, we vacate the judgment of that court and remand the cause for further proceedings in accordance with this opinion.

VACATED AND REMANDED.

ALVIN B. RUBIN, Circuit Judge, with whom RANDALL and PATRICK E. HIGGINBOTHAM, Circuit Judges, join, dissenting:

Political belief, association, and activity are at the core of the activities protected by the first amendment.[1] A public official has no greater right to tell a public employee what candidate to support or how to vote than he has to tell that employee what church he may attend or what books he may read. Neither may officialdom punish an employee by failing to rehire him because he read the wrong books, attended the wrong church, or supported the wrong politician. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."[2]

The spoils system, which views public employment as pure political patronage, inhibits the free functioning of the electoral process. "Conditioning public employment on partisan support prevents support of competing political interest."[3] By holding a public employee's job hostage to his political activities or affiliation, the rebirth of the spoils system sanctioned by the majority allows an incumbent or a victorious chal-

---

1. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

2. *Board of Education v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1932).

3. *Elrod v. Burns,* 427 U.S. at 356, 96 S.Ct. at 2681, 49 L.Ed.2d at 555 (1976).

lenger to accomplish indirectly what neither could legally do by mandate: the coercion of political support from the public employee.

The first amendment protects a public employee when he expresses and acts on political beliefs no less when he supports a losing candidate than when he adheres to a losing political party. Its armor does not guard only "abstract political views" held *in pectore* or expressed by simple party affiliation: it protects the entire range of free expression of beliefs and actions so long as they do not adversely affect the public employee's ability to perform his job efficiently. Without violating the first amendment, the state and its agencies may discharge, refuse to hire, or fail to rehire an employee for no reason or for any reason at all save one: it may not retaliate for the employee's exercise of his rights of free expression. Public employment does not demote the jobholder to second-rate status under the Constitution. The majority opinion tears holes in these established protections by finding qualifications of them in *Connick v. Myers,*[4] a Supreme Court opinion that dealt with a different problem but, insofar as it here applies, fully endorsed each of the principles just stated. I, therefore, respectfully dissent.

## I.

Because we are neither legislators nor constitution-writers, but appellate judges, let us start, as all cases must, with the facts. The panel opinion was vacated by our order to rehear the case en banc.[5] The majority opinion expressly declines to reinstate the panel opinion. Nothing in the majority opinion states that the district court factfindings are clearly erroneous, nor indeed, on the record before us, could they be found in error. Yet the majority opinion vacates those findings. In doing

so, it disregards the mandate of Fed.R. Civ.P. 52(a), as reinforced by *Pullman-Standard v. Swint.*[6] Even when an appellate court remands for application of a new rule of law, it is not given the option of disregarding the district court's fact-findings by simply saying, "rub it all out and start over."

In Jim Hogg County, the Democratic party dominates the political landscape. Party nomination, therefore, ensures victory in the general election. Gilbert Ybanez opposed the incumbent Sheriff, Juan Ramirez, for the Democratic party nomination. Ybanez ran on a platform that promised the voters a change in administration. The campaign was spirited. Each candidate sponsored parades and rallies, locally called "pachangas." Three of the field deputy sheriffs who had been employed by Ramirez campaigned actively on his behalf. One of the dispatchers, Stephanie Spencer, also supported Ramirez. There is no intimation in the record that any of these employees attacked Ybanez personally or did anything unseemly in the slightest. The other dispatcher, Jimmie McBee, who was also Ramirez's secretary, apparently took no part in the campaign. Ybanez won the Democratic primary and was elected, without opposition, in the general election.

"Ybanez candidly testified that it was the existing custom in Jim Hogg County for a new sheriff to fire all the staff of his predecessor ... to bring in 'his own people.' "[7] Ramirez's term ended December 31. A few days before then, Ybanez telephoned Ramirez and told Ramirez that he was to inform his employees that they were no longer to be employed by the sheriff's office unless Ybanez communicated with them.

The sheriff's office employed six deputy sheriffs, four dispatchers, and three custodians (who apparently did janitorial

---

**4.** 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

**5.** Local Rule 41.3.

**6.** 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).

**7.** I quote the district court's findings.

work).[8] Ybanez rehired one deputy, one dispatcher, and the three custodians. Three of the deputies and two of the dispatchers who were not rehired contend that Ybanez's failure to rehire them was in retaliation for their exercise of their first amendment rights.

Ramirez testified that all of the deputy sheriffs and dispatchers were competent employees who were satisfactorily performing their jobs. Ybanez never asked Ramirez for an evaluation of the job performances of any of them. According to the district court, Ybanez testified that he had no reason to believe that "any persons he employed [after he took office] were any more qualified than the people they replaced." Three of the deputy sheriffs who were replaced were Certified Peace Officers. At least two and possibly three of the new deputies hired by Ybanez were not certified.

The district court found that Ybanez based his employment decisions "entirely upon his perceptions as to the extent of prospective employees' support for and loyalty to him and his candidacy." "He made statements to the effect that he wanted 'his people' in office and that 'politics was politics.'" "He conceded that his appointees were no more qualified than their predecessors and indeed the evidence confirms that, at least as to the field deputies, they were definitely less qualified." "[T]he failure to continue the employment of the plaintiffs was motivated by an intent on the part of Ybanez to remove them in order to make room for his own political supporters." While Ybanez offered reasons for not rehiring the three fired deputies, the district court found them "pretextual afterthoughts, offered to justify his political decisions."

After making these findings, the district court stated the issue before it: "does the *Elrod—Branti* rationale apply when employment decisions are based upon the support of and loyalty to an individual politician as distinguished from a political party"? It answered, "Yes," and so do I. To understand why that answer is correct, we must turn to the Supreme Court cases.

II.

After the nation had for almost two centuries accepted political patronage as a political right and reality, the Supreme Court first assessed the relationship of the spoils system and the first amendment in *Elrod v. Burns*.[9] The plurality (Justices Brennan, White, and Marshall) there stated the question before the court:

Whether public employees who allege that they were discharged or threatened with discharge solely because of their partisan political affiliation or nonaffiliation state a claim for deprivation of constitutional rights secured by the First and Fourteenth Amendments.

427 U.S. at 349, 96 S.Ct. at 2678, 49 L.Ed.2d at 551. The opinion did not concern mere "abstract" party loyalties, for in that case the employees were not only "required to pledge their political allegiance to the Democratic Party," but they were required also to "work for the election of other candidates of the Democratic Party, contribute a portion of their wages to the Party, or obtain the sponsorship of a member of the Party, usually at the price of one of the first three alternatives." 427 U.S. at 355, 96 S.Ct. at 2681, 49 L.Ed.2d at 555.

The majority opinion echoes the Court's plurality opinion in *Elrod* when it says that "the prohibition on encroachment of First Amendment protections is not an absolute."[10] That starts our inquiry, but it does not end it. Restraints on first amendment rights are permitted for appropriate reasons. The question is what restraints are permissible and when. Even beliefs and associations may be made a condition of public employment if they are demonstrably relevant to the requirements of the

---

8. Ramirez's staff had included eight deputies but two of these jobs were eliminated by the County Commission "for economy reasons."

9. 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547.

10. *Elrod v. Burns*, 427 U.S. at 360, 96 S.Ct. at 2673, 49 L.Ed.2d at 558.

job in question.[11] Employees may be discharged, not hired, or not continued in public employment for good cause, or, indeed, for no reason at all so long as their exercise of first amendment rights is not *the* reason. Even patronage hiring and dismissals are permissible for persons in confidential or policymaking positions.[12]

While all the views expressed in *Elrod*'s plurality opinion did not gain majority support, there is no doubt that the *holding* of the case, which is directly applicable here, did. Justice Stewart, with whom Justice Blackmun concurred, stated it succinctly:

> The single substantive question involved in this case is whether a nonpolicymaking, nonconfidential government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs. I agree with the plurality that he cannot.

*Id.*, 427 U.S. at 375, 96 S.Ct. at 2690, 49 L.Ed.2d at 566.

Almost five years later, the Court affirmed this holding in *Branti v. Finkel.*[13] That case involved a public defender who threatened to terminate the employment of six out of nine assistant public defenders, serving at his pleasure, because they were Republicans. According to the trial court, "the evidence show[ed] that the only reason for which [the public defender] sought to terminate plaintiffs as assistants was that they were not recommended or sponsored pursuant to the procedures that had been decided upon by the Democratic caucus." 445 U.S. 508, 510, n. 5, 100 S.Ct. 1287, 1290 n. 5, 63 L.Ed.2d 574, 579 n. 5.

Six members of the Court joined in Justice Stevens' opinion enjoining the discharge of the Republicans. Quoting *Perry v. Sindermann*[14] the Court said, "[the government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."[15] The Court then held, "it is manifest that continued employment of an assistant public defender cannot properly be conditioned on his allegiance to the political party in control of county government."[16] I submit that it is equally apparent that continued employment of deputy sheriffs and dispatchers cannot properly be conditioned on their allegiance to a newly elected sheriff. I cannot follow a distinction between abstract belief and party allegiance on the one hand and support of a candidate on the other, for in my opinion, the first amendment protects both.

The majority's interpretation of the use of the word "private" in *Branti* stands that opinion's reasoning on its head. *Branti* did not even purport to narrow *Elrod*'s reach to embrace only those political beliefs kept in the closet. Indeed, it stands for the contrary proposition for the Court was responding to the defendant's argument that *Elrod* was limited "to situations in which government employees are coerced into pledging allegiance to a political party that they would not voluntarily support and does not apply to a simple requirement that an employee be sponsored by the party in power...." 100 S.Ct. at 1292. In rejecting this argument, the *Branti* Court did not limit but *extended Elrod* to prohibit dismissal "of a public employee solely because of his private political beliefs." *Id.* at 1294. To rule otherwise, the Court said, would "emasculate the principles set forth

---

11. *Hollon v. Pierce*, 257 Cal.App.2d 468, 64 Cal. Rptr. 808 (3d Dist.1967) (sustaining discharge of a school bus driver who plied his religious belief that young children should be ritually sacrificed).

12. *Elrod v. Burns*, 427 U.S. at 368, 96 S.Ct. at 2687, 49 L.Ed.2d at 562.

13. 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

14. 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

15. *Id.*, 445 U.S. at 515, 100 S.Ct. at 1293, 63 L.Ed.2d at 582.

16. 445 U.S. at 519, 100 S.Ct. at 1287, 63 L.Ed.2d at 584. Justice Stewart joined in this view. He dissented because he thought that lawyers in a public defender's office are confidential employees.

in *Elrod.*" Permitting dismissal for this reason "would perhaps eliminate the more blatant forms of coercion described in *Elrod*," but "it would not eliminate the coercion of belief that necessarily flows from knowledge that one must have a sponsor in the dominant party in order to retain one's job." *Id.* at 1293–94 (footnote omitted).

*Connick v. Myers* [17] does not take one whit from *Elrod* or *Branti.* In fact, the *Connick* opinion cites both of those earlier opinions squarely for the protections they recognized.[18] It does not even deal with the issues presented by this case save as to McBee, the dispatcher whose non-retention was sought to be justified on the basis of her betrayal of confidential information.

The issue in *Connick* was not patronage dismissals at all but whether, "the First and Fourteenth Amendments prevent the discharge of a state employee for circulating a questionnaire concerning internal office affairs." [19] Connick, the district attorney, had fired Myers, an assistant, for refusing to accept a transfer and for insubordination in distributing a questionnaire to other employees. The Court said that the distribution of the questionnaire was not "wholly without First Amendment protection," but it found "much force" in the district attorney's view that Myers' communication did not relate to a matter of public concern.[20]

Only one question in the assistant's questionnaire touched upon a matter of public concern. The Court's discussion of that question is of particular significance here:

> Question 11 inquires if assistant district attorneys "ever feel pressured to work in political campaigns on behalf of office supported candidates." We have recently noted that official pressure upon employees to work for political candidates not of the worker's own choice consti-

tutes a coercion of belief in violation of fundamental constitutional rights. *Branti v. Finkel*, 445 U.S. 507, 515–516, 100 S.Ct. 1287, 1293, 63 L.Ed.2d 574 (1980); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

461 U.S. at ——, 103 S.Ct. at 1691, 75 L.Ed.2d at 721–22. The Court continued:

> we believe it apparent that *the issue of whether assistant district attorneys are pressured to work in political campaigns is a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal.*

*Id.* (emphasis added).

In reaching this conclusion, the Court discussed at length the evolution of its doctrine concerning what is a matter of public concern and the protection of the right of public employees to engage in full expression on such matters; it did *not* revisit the issue of discharges or refusals to rehire an employee for supporting a losing candidate. We do not need to guess at its holding, the Court stated it:

> We hold *only* that when a public employee speaks *not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest*, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

461 U.S. at ——, 103 S.Ct. at 1690, 75 L.Ed.2d at 720. (Emphasis added.)

The *Connick* Court concluded that Myers' discharge did not violate the first amendment because it was *not* in retalia-

---

**17.** 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

**18.** The *Connick* opinion first cites *Branti* for the general proposition that "[f]or at least 15 years, it has been settled that a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." 461 U.S. 138, ——, 103

S.Ct. 1684, 1687, 75 L.Ed.2d 708. The second citation is quoted in the text, post.

**19.** *Connick*, 461 U.S. at ——, 103 S.Ct. at 1686, 75 L.Ed.2d at 715.

**20.** *Id.*, 461 U.S. at ——, 103 S.Ct. at 1688, 75 L.Ed.2d at 717.

tion for her political or other protected first amendment activities, and because the district attorney "reasonably believed [that her actions] would disrupt his office, undermine his authority, and destroy close working relationships." [21]

Connick traces its roots to Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).[22] In Pickering, a school board dismissed a teacher who had published, in a local newspaper, a letter critical of the board's handling of past proposals to raise new revenue for the school system and its subsequent allocation of funds between the system's athletic and academic programs. The Court determined that it must balance the state's interest in "promoting the efficiency of the public services it performs through its employees" against the interests of those employees, as citizens, in "commenting upon matters of public concern." Subsequent cases, therefore, have applied Pickering and Connick to situations involving dismissals of an employee whose speech criticized his or her employer.[23]

Both Pickering and Elrod involve, as the majority observes, "public employment and the First Amendment." Both considered the circumstances in which a government employer might permissibly discharge a public employee for the employee's expressive or associational activities. It is not surprising, therefore, that both cases examined similar considerations to determine when the employer's interest outweighed that of the employee: the relationship between the employee and the employer and the effect the speech or association had on that relationship. The distinction the majority opinion fails to acknowledge is that Elrod and Branti, like this case, involved retaliation for political beliefs and associations—free expression that did not threaten the efficient conduct of public office unless the employees' position required political loyalty. Pickering, like Connick and similar pre-Connick cases, involved speech that arguably threatened the integrity of employer-employee relations, and therefore each case required the interests to be balanced anew.[24]

## III.

The district court has found that Ybanez did not fail to rehire any of the deputy sheriffs or Spencer, the dispatcher, for any of the reasons held justifiable in Connick. Moreover, Ybanez did not react merely to the former employees' "abstract political views." Instead, like the politicians in both Elrod and Branti, he sought solely to put his "own people" into the sheriff's office. The replaced persons were neither insubordinate nor incompetent, they merely failed to support Ybanez's candidacy. The failure to rehire them squarely violates Elrod; it does not entail the factors considered in Pickering.

Once the district court found that the sole reason for Ybanez's failure to rehire the employees was his desire to staff the office with his "own people," the only issue was whether political affiliation was "essential to the discharge of the employee[s'] governmental responsibilities." Branti v. Finkel, 445 U.S. at 518, 100 S.Ct. at 1295,

21. Id., 461 U.S. at ——, 103 S.Ct. at 1694, 75 L.Ed.2d at 724.

22. See id., 461 U.S. at ——, 103 S.Ct. at 1686, 75 L.Ed.2d at 715.

23. See, e.g., Egger v. Phillips, 710 F.2d 292 (7th Cir.) (en banc), cert. denied, —— U.S. ——, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983); Gonzalez v. Benavides, 712 F.2d 142 (5th Cir.1983); Rookard v. Health and Hospitals Corp., 710 F.2d 41 (2d Cir.1983); McGee v. So. Pemiscot School District R–V, 712 F.2d 339 (8th Cir.1983); Hughes v. Whitmer, 714 F.2d 1407 (8th Cir.1983); McKinley v. City of Eloy, 705 F.2d 1110 (9th Cir.1983);

Leonard v. City of Columbus, 705 F.2d 1299 (11th Cir.1983).

24. Barrett v. Thomas, 649 F.2d 1193 (5th Cir. 1981), cert. denied, 456 U.S. 925, 102 S.Ct. 1969, 72 L.Ed.2d 440 (1982), illustrates well this distinction because it involved a challenge to personnel regulations prohibiting abusive, insulting, or indecent language directed to a supervisory officer, as well as alleged patronage demotion and transfer. The court cited Pickering in upholding the regulation as a permissible regulation of speech, but based its analysis of the patronage retaliation claims squarely on Elrod and Branti. 649 F.2d at 1200–02.

63 L.Ed.2d at 584.[25] I agree with the majority that the size of a public office alone cannot determine the standard of first amendment protection. We said in *Barrett v. Thomas*[26] that in an office employing 550 deputies and 150 other workers, "the absence of political cohesion between sheriff and deputy can hardly be said to undermine an intimate working relationship." *Id.* But that does not conclude the validity of the inverse proposition: that a small office necessarily demands political fealty to function effectively. Sheriff Ybanez never even asserted that it did.[27] The district court concluded that "there was no evidence whatever that the political beliefs or associations or voting history of any of the Plaintiffs in any way impaired their fairness or efficiency on the job. As to the dispatchers, the Defendant made no showing of any kind why political loyalty was necessary for proper performance of their duties."[28]

The majority draws attention to the fact that this case involves support of an individual Democrat as opposed to party affiliation. I do not understand its opinion to intimate that the first amendment is diluted when applied to public employees who happen to work in a one-party county. The Constitution applies alike to Illinois and to Texas, to Cook County and to Jim Hogg County. Its standards do not vary with the size of governmental units or the supposed perceptions of local voters. In many counties, there is no real two-party system in local election contests. The prevailing party is either Republican, as is typical in many parts of the mid-west, or Democratic, as it is in most of the "solid south." The competing candidates represent factions that pay at least nominal fealty to the same party. Voting is determined by factional rather than party adherence and by the personalities of those who compete for the party nomination that is the guarantee of victory. Had the political activities of the plaintiffs constituted an *ad hominem* attack against Ybanez, the discussion contained in the penultimate paragraph of the majority opinion would have some relevance.[29] The connection would arise, however, not from the distinction between a one-versus a two-party county, but because the employees' speech had destroyed the possibility of an effective employer-employee relationship.

Finally, the majority hangs part of its decision on the slender peg that some of the plaintiffs did not ask Ybanez to reemploy them. We do not exact meaningless gestures. Application would have been futile. The handwriting was on the wall for all to see: Ramirez had discharged *all* em-

---

**25.** *See, e.g., Tanner v. McCall,* 625 F.2d 1183, 1189–90 (5th Cir.1980), *cert. denied,* 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981); *Barrett v. Thomas,* 649 F.2d 1193, 1200–02 (5th Cir.1981), *cert. denied,* 456 U.S. 925, 102 S.Ct. 1969, 72 L.Ed.2d 440 (1982); *Wren v. Jones,* 635 F.2d 1277, 1286 (7th Cir.1980), *cert. denied,* 454 U.S. 832, 102 S.Ct. 129, 70 L.Ed.2d 110 (1981); *Douglas v. Galloway,* 568 F.Supp. 966 (S.D.W. Va.1983).

**26.** 649 F.2d at 1201.

**27.** Had this been the issue, the burden was on the sheriff to prove it as an affirmative defense and a question of fact. *Stegmaier v. Trammell,* 597 F.2d 1027, 1034 n. 4 (5th Cir.1979).

**28.** When our court considered a case involving the discharge of the single Deputy Circuit Clerk of Cherokee County, Alabama, we did not even hint that *Elrod* should not apply with full force. *Stegmaier v. Trammell,* 597 F.2d 1027 (5th Cir. 1979). Cherokee County's population, accord-

ing to the Rand-McNally Atlas, was 18,760 on April 1, 1980. *Stegmaier* drew from *Elrod* a distinction between *confidential* employees and policy-makers. The deputies and dispatchers here involved appear to be no more confidential employees than they were policy-makers. Finally, to base the availability of an exception on the size of the county would allow the exception to engulf the rule. Almost sixty percent of the counties, and ninety-six percent of the municipalities and townships in the United States have a population of less than twenty-five thousand. Bureau of the Census, Dep't. of Commerce, 1982–83 Statistical Abstract of the United States (103d ed.) at 295. *Cf.* Note, *Nonpartisan Speech in the Police Department: The Aftermath of Pickering,* 7 Hastings Con.L.Q. 1001, 1002 n. 7 (noting that the public work force constituted, in 1978, 16.5% of the nation's employed population; restrictions on the speech of such a large percentage should be a matter for serious concern).

**29.** *See supra* note 24.

ployees, the established practice was to give jobs to the new sheriff's people. Dispatcher Spencer and Deputy Contreras are the two who did not ask Ybanez for continued employment. Contreras testified, however, that Ybanez "approached me and he stated that he was sorry, but politics was politics, but I could wait for him, that at a later date some thing might come up, *but not under him.*" Even if application made a difference, the failure of some deputies to apply would surely not justify Ybanez's failure to reemploy those who did affirmatively seek to be continued.

### IV.

McBee had been both chief dispatcher and secretary to Ramirez. Ybanez did offer to continue her employment, but only as a dispatcher and at reduced pay. He proposed to give her secretarial duties to a new employee. Ybanez also told her of his plans not to retain a majority of the remaining staff. McBee protested that this was not fair and also complained of losing her secretarial job. The next week she spoke to the County Judge and also to one of the County Commissioners, complaining of Ybanez's proposed course of action and "apparently" (according to the district court) seeking their advice or assistance in attempting to dissuade him. Ybanez learned of her actions and revoked his offer to McBee because she was "making trouble" and he anticipated that she would be a trouble-maker on the job.

The district court found that Ybanez's desire to separate the secretarial from dispatcher functions was not politically motivated. It also found that her protests to county officers were an exercise of "freedom of speech."

Only to McBee's situation does the *Pickering-Connick* analysis apply. But nothing in the majority opinion tells us how "the balancing test" affects her claim. Its application requires her reinstatement.

The first step, under *Connick*, is to determine whether McBee's speech involves matters of "public concern." *Connick* expressly held that "the issue of whether assistant district attorneys are pressured to work in political campaigns is a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." 461 U.S. at ——, 103 S.Ct. at 1691, 75 L.Ed.2d 721. Patronage dismissals of deputies and dispatchers are no less matters of public concern.

The *Pickering—Connick* balance next requires us to weigh the government's interest in the effective and efficient fulfillment of its responsibilities to the public. *Connick*, 461 U.S. at ——, 103 S.Ct. at 1692, 75 L.Ed.2d at 721–22. There is no evidence in the record to suggest that McBee's consultation with county officials impeded her ability to perform a *dispatcher's* duties. The district court found that Ybanez discharged McBee because he viewed her as a "troublemaker." *Connick*, and *Pickering* as well, instruct us to consider the effect the employee's speech might have on her relationship with her employer, and on the need for maintaining a harmonious working relationship. But neither permits a discharge solely because an employee might insist upon her rights. The question is whether the employee's speech would disrupt the conduct of the public office or manifest insubordination to a superior. In deciding this, the Court has looked at the "manner, time, and place" in which the speech occurred. *Connick*, 461 U.S. at ——, 103 S.Ct. at 1693, 75 L.Ed.2d at 724. McBee addressed her complaints to the appropriate officials, on her own time, and in a circumspect manner.[30] Her speech hardly approached the "mini-insurrection" Myers' questionnaire was said to have caused Connick's office. She did not challenge Ybanez's authority in the office,[31]

---

**30.** Indeed, as the *Connick* Court noted, "[e]mployee speech which transpires entirely on the employee's own time, and in non-work areas of the office, bring different factors into the

*Pickering* calculus, and might lead to a different result." 103 S.Ct. at 1693 n. 13.

**31.** *See Gonzalez v. Benavides,* 712 F.2d 142 (5th Cir.1983) (executive director of a community

harass or attack him personally,[32] or seek to foment public antipathy for his administration.[33] Her speech deserves protection not only because it was free speech, but also because it was manifestly a petition for the redress of a grievance from the only governmental body able to afford relief.

### IV.

A rule that protects *only* abstract beliefs is almost meaningless. Abstract beliefs need little protection. They threaten only those who cannot tolerate heresy. Words unspoken win no converts. Political beliefs cherished only in the mind win no elections. The right at stake in this case is the freedom to *associate* with the political party or the politician of one's choice, as well as the freedom to hold the beliefs of one's intellect. The first amendment does not protect only freedom of belief or the use of words. It safeguards conduct that is part of freedom of expression. The state cannot, without compelling reason, prohibit wearing armbands in school,[34] display of a peace symbol on a United States flag,[35] or library sit-ins[36] any more than it can prohibit holding the ideas that such conduct expresses. The first amendment protects the right to free expression as well as the right to petition for a redress of grievances.

In an ideal state, continuation in a government job should turn only on efficiency and ability. The Constitution does not mandate Erewhon. It permits public employment to be made dependent on other factors, including the whim of the employer. But the Constitution imposes some limits on the public employer: the public employee is entitled to due process, equal protection, and to freedom of expression. Save as restrained by proper statutory restrictions on their political activity, such as the Hatch Act, and the necessity for fidelity to their duties, public employees enjoy the right to speak their minds and to participate in the elective process. Job sacrifice may not be exacted as a reprisal for the exercise of free expression. Today's decision makes possible just such retaliation. It undermines the first amendment bulwark of *Elrod* and *Branti* and threatens the firing of every public employee who does not support the incumbent if the incumbent wins, or who does support the incumbent if he loses. Loss of a job may not constitutionally be made the price of attending—or failing to attend—a pachanga.

For these reasons, I respectfully DISSENT.

**TATE, Circuit Judge, concurring:**

I concur in the result reached by the majority. However, I am unable to disagree with the view expressed by Judge Rubin's dissent that *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), addressed issues of no special relevance to those now before us and was not intended to modify the *Elrod-Branti* rationale that First Amendment rights of public employees are offended if they are discharged solely because of their private political beliefs. Although I as a citizen and judge may agree more with Justice Powell's dissent in *Elrod v. Burns*, 427 U.S. 347, 376–89, 96 S.Ct. 2673, 2691–97, 49

action agency publicly denied that county commissioners had any supervisory authority over his and his assistant's job performance).

**32.** See *Hughes v. Whitmer*, 714 F.2d 1407 (8th Cir.1983) (highway patrolman mounted campaign of harassment and intimidation against superior).

**33.** See *McKinley v. City of Eloy*, 705 F.2d 1110 (9th Cir.1983) (police department employee, as representative of labor organization, publicly criticized city's refusal to give officers an annual raise); *Leonard v. City of Columbus*, 705 F.2d 1299 (11th Cir.1983) (executive director of black policemen's league held press conference and staged demonstration to protest department's treatment of black policemen).

**34.** *Tinker v. Des Moines School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

**35.** *Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974).

**36.** *Brown v. Louisiana*, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (plurality opinion).

L.Ed.2d 547 (1976), fidelity to the concept of ordered liberty under our Constitution requires us, as an intermediate court, to follow *Elrod* and *Branti* as controlling interpretations of First Amendment rights.

Nevertheless, ultimately, I concur because I do not believe *Elrod-Branti* requires that a newly-elected sheriff of a small county with a small staff (here, six deputies and four dispatchers) give any special consideration in making his own new appointments to deputies appointed by a former sheriff. This proposition would, I assume, be indisputable, if the former deputies had taken no active part in the political campaign that resulted in the new sheriff's defeat of the former sheriff. In a small office like the present, of necessity there must be an intimate relationship between the sheriff and his appointed staff, each of whom—in a small-county context—will be regarded by the public (and the voters) as the alter ego of the new sheriff in all their official acts.

Thus, I do not believe the reach of *Elrod-Branti* extends so far as to prevent a newly-elected sheriff of a small county from selecting, as deputies for his small staff, persons other than those of his predecessor's staff—whether or not the latter had actively and publicly opposed the new sheriff in his successful effort to defeat the former sheriff to whom these former deputies owed their appointment and their loyalty. To hold otherwise, would be to permit an incumbent deputy to assure himself of perpetual tenure if he actively and publicly supported his respective incumbent sheriffs in each of their succeeding political campaigns. I do not believe that the *Elrod-Branti* rationale intended that the First Amendment be used as a sword instead of a shield.

I am thus more in accord with the rationale of the panel opinion in this case, 703 F.2d 834, 841–42 (1983), and with the views of the Fourth Circuit in *Ramey v. Harber*, 589 F.2d 753, 755–57 (4th Cir.1978), *cert. denied*, 442 U.S. 910, 99 S.Ct. 2823, 61 L.Ed.2d 275 (1979), than I am with the en banc majority's rationale.

I therefore concur only in the result of the majority.